UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

In re:

IRENE MULKERIN, Debtor (Pro Se)

Case No. 1:24-bk-03264-HWV

Chapter 7

FILED
**March 19, 2025**
Clerk, U.S. Bankruptcy Court
Middle District of Pennsylvania
Harrisburg

BRIEF IN SUPPORT OF MOTION TO COMPEL THE TRUSTEE OF THE ANDREW V. PAPOUTSIS IRREVOCABLE TRUST TO AUTHORIZE PERIODIC DISTRIBUTIONS

INTRODUCTION

Pursuant to her rights as a beneficiary of the Andrew V. Papoutsis Irrevocable Trust—and in light of a longstanding pattern of arbitrary denials by the Trustee and other fiduciaries—the Debtor, respectfully submits this Brief in Support of her Motion to Compel the Trustee to authorize periodic distributions from the Trust. Specifically, the Debtor seeks monthly distributions—net of any applicable taxes (as detailed in Document 55 and Document 191)—to cover her essential living expenses, along with a one-time down payment for two cars. These funds are essential not only because they are long overdue but also to provide the Debtor with the necessary means to meet her basic living expenses and to enable her to pursue a conversion to a Chapter 13 reorganization if it becomes necessary to protect her legal and financial rights under the law.

FACTUAL BACKGROUND

1. Trust Establishment and Purpose

The Andrew V. Papoutsis Irrevocable Trust, established on December 13, 2012, is a spendthrift trust created expressly to secure the welfare and financial security of its beneficiaries, including the Debtor, who holds a one-third beneficial interest in the trust.

2. Asset Holdings

The Trust holds substantial assets, including closely held business interests formally valued at over $8.8 million. However, the Debtor contends that this figure may be understated—by as much as a factor of three. Financial statements produced by Wilmington Trust Company contain material inconsistencies raising concerns of misrepresentation, which in turn warrant immediate investigation. Such discrepancies strongly suggest the possibility of fraud or deliberate undervaluation, highlighting the urgent need for a forensic review.

The mechanisms embedded within the Trust document, as demonstrated in Exhibit A, appear to be deliberately structured to create a self-reinforcing cycle of opacity and unaccountability, preventing beneficiaries from ever obtaining full transparency or access to rightful distributions. This structure, resembling a Möbius strip in its self-contained and circular logic, operates to ensure that no external scrutiny can effectively challenge its administration. However, this cycle must end with the oversight of this Honorable Court and Judge Van Eck's authority.

While the Debtor acknowledges that a full examination of these valuation-related issues falls beyond the immediate scope of this Motion, she fully intends to present evidence and arguments addressing these concerns at the upcoming hearing scheduled for March 26, 2025. That hearing will serve as a critical opportunity to expose the financial inconsistencies and their broader implications for the estate and the Trust's administration.

3. Pattern of Arbitrary Denials and Questionable Assertions

The Trustee and fiduciaries have repeatedly and arbitrarily denied reasonable distribution requests, effectively depriving the Debtor of her rightful financial support under the Trust. The Trustee's actions have forced the Debtor into financial distress, despite the Trust's purpose being explicitly to provide for her welfare.

The Trustee's counsel, Robert Chernicoff, has inaccurately claimed that the Debtor's interest in the Trust is entirely under the control of the Chapter 7 Trustee. This assertion is not legally supportable and conflicts with both the Trust's terms and well-established fiduciary principles.

4. History of Distribution Requests

2

- In April 2023, the Debtor made her first formal request for a distribution from the Trust, citing financial necessity.

- Despite the Trust's express purpose and Wilmington Trust Company's own guidelines recommending annual distributions of approximately 7–8%, all requests have been either denied outright or ignored.

- This pattern of denials has forced the Debtor into bankruptcy, constituting a failure by the Trustees to fulfill their fiduciary obligations.

5. Financial Hardship and the Need for Relief

The Debtor faces significant mortgage arrears and basic living costs that are not being addressed due to the Trustees' refusals. Without distributions from the Trust, the Debtor will remain financially incapacitated and unable to transition to a Chapter 13 plan.

LEGAL ARGUMENTS

A. Trustees Must Exercise Discretion in Good Faith and in Consideration of Beneficiary Needs

Trustees are legally bound to act in good faith and cannot arbitrarily deny support to beneficiaries in need. Courts have repeatedly held that when a trustee abuses discretion or refuses necessary distributions, judicial intervention is warranted.

Key legal precedents supporting the Debtor's motion include:

- Marsman v. Nasca, 30 Mass. App. Ct. 789 (1991): Trustees must act in good faith and cannot deny support arbitrarily.

- Estate of Green, 172 Cal. App. 4th 907 (2009): Trustees are required to consider the financial needs of the beneficiary.

- Covenant Trust Co. v. Guardianship of Stevens, 206 So. 3d 700 (Fla. Dist. Ct. App. 2016): A trustee's discretion must not be exercised to the detriment of the trust's purpose.

CONCLUSION

- The Debtor needs clarity regarding the availability of Trust funds. If the Court declines to compel their release, that decision should be stated plainly

3

so that they can plan their affairs accordingly. The Trust was designed to benefit the Debtor, yet every effort appears to have been made to deny her access.

Respectfully submitted,

/s/ Irene Mulkerin
Pro Se Debtor
1740 Adeline Drive
Mechanicsburg, PA 17050

EXHIBIT A

SUMMARY OF TRUST CLAUSES THAT PREVENT ACCOUNTABILITY

1. Structural "Hands-Off" Trustee Obligations

- The Trustee is only authorized to distribute trust income or principal upon the written direction of the Distribution Adviser. If the Distribution Adviser fails to provide direction, the Trustee is permitted to take no action.
- Effect: The Trustee can disclaim responsibility by pointing to the Distribution Adviser's silence or refusal to issue written instructions.

2. Trustee's Powers Are Theoretically Broad But Functionally Restricted

- While the trust grants the Trustee broad powers over sales, investments, and legal actions, another provision states that these powers cannot be exercised without written consent or direction from the Investment Adviser.
- Effect: The Trustee can refuse to act, citing "no consent" from the Investment Adviser. No deadlines or enforcement mechanisms exist to compel prompt consent.

3. Investment Adviser: No Fiduciary Obligation to Monitor

- The trust explicitly states that the Investment Adviser "need not inquire into Trustee's performance of its duties and shall not be held liable for any loss unless it results from actions in bad faith."
- Standard fiduciary obligations—such as monitoring trust assets or ensuring accurate valuations—are waived by the trust document.
- Effect: The Investment Adviser has no incentive to ensure the Trustee acts responsibly or provides accurate valuations, as liability is avoided unless bad faith is explicitly proven.

4. Distribution Adviser: No Duty to Oversee the Trustee

- The Distribution Adviser is empowered to determine whether a beneficiary meets eligibility requirements but is explicitly relieved of any duty to oversee the Trustee's actions.

5

- Effect: The Distribution Adviser can remain silent on distributions or refuse to act entirely, knowing the trust immunizes it from liability for inaction.

5. Trust Protector: Removal Powers, But No Duty to Use Them

- The Trust Protector is granted the authority to remove or replace the Trustee and the Investment Adviser, theoretically serving as an oversight mechanism.

- However, the trust states the Trust Protector "shall have no duty to monitor" and "shall not be liable for failing to exercise any power."

- Effect: Even though the Trust Protector has the power to fix problems by removing bad actors, there is no requirement or enforcement mechanism compelling intervention.

6. Result: No Single Entity Must Act

- The Trustee claims it lacks authority without written directives from an Adviser.

- Both the Distribution and Investment Advisers disavow responsibility for monitoring or producing valuations.

- The Trust Protector is not required to intervene.

- Overall Effect: Each party can legitimately say "not my job," creating an endless loop of finger-pointing that leaves beneficiaries with no practical enforcement route.

7. Constructive Fraud & Beneficiary Limbo

- On paper, the trust appears to have multiple "checks and balances": Trustee, Distribution Adviser, Investment Adviser, and Trust Protector.

- In reality, each role is shielded from accountability by disclaimers such as "no duty to inquire" or "shall not be liable unless bad faith."

- Practical Outcome: Beneficiaries—like the undersigned—are effectively blocked from receiving trust distributions or business valuations because every fiduciary entity can pass responsibility onto another.

Conclusion

These trust clauses, taken together, undermine standard fiduciary responsibilities and leave beneficiaries without any functional recourse to compel action or disclosure. They create a "constructive fraud" scenario by neutralizing typical accountability measures and placing beneficiaries in perpetual limbo.

Under fundamental trust law principles and the broad equitable powers of the Bankruptcy Court, the parties controlling trust assets cannot evade fiduciary duties through procedural loopholes. Accountability must be enforced, and the mechanisms enabling this cycle of inaction must be scrutinized and reformed.