# EXPERT CRITIQUE OF THE TUCKER & MELTZER VALUATION REPORT

*(APX York Sheet Metal, Inc. – Valuation as of December 31, 2023)*

FILED
March 25, 2025
Clerk, U.S. Bankruptcy Court
Middle District of Pennsylvania
Harrisburg

**Prepared By:**

**Andy Mulkerin**

**MBA, Harvard Business School**

**BS, Chemical Engineering, Columbia University**

Former Senior Manager, YSM

Founder & Managing Director, Nicobar Group (Shanghai)

**Date:** March 25, 2025

---

## Purpose of This Critique

This document serves as a professional critique of the Tucker & Meltzer ("T&M") valuation report on APX York Sheet Metal, Inc. ("YSM"), dated December 31, 2023. It is intended to assist the Court, trustees, creditors, and other stakeholders in assessing the report's methodology, data integrity, and overall credibility within the context of ongoing legal and fiduciary proceedings.

---

## Scope of Analysis

1. **Review of T&M's Methodological Framework** – Examines the approaches T&M claims to have employed (income, market, and/or asset-based) and whether they adequately address the unique operational and financial complexities of YSM.

2. **Evaluation of Data Reliability** – Considers T&M's reliance on unaudited, management-provided figures and the absence of independent verification in light of suspected fraud or irregularities.

3. **Examination of Major Omissions** – Addresses the failure to incorporate a robust asset-based "floor," neglect of significant capital equipment, and insufficient scrutiny of inter-company transfers.

4. **Assessment of Disclaimers & Potential Conflicts** – Reviews T&M's refusal to defend its findings under adversarial scrutiny and analyzes how the controlling owners' payment for the valuation impacts the objectivity of the report.

## Qualifications & Background

I, Andrew William Mulkerin, hold an MBA from Harvard Business School and a BS in Chemical Engineering from Columbia University. Over a span of two decades, I have:

- Served in senior managerial roles at YSM, directly overseeing operational and capital expenditures.

- Founded and led Nicobar Group (Shanghai), specializing in complex U.S.–China consulting engagements in heavy industry and advanced commercial nuclear fields.

- Advised on and conducted valuations or operational audits in contexts requiring stringent verification, such as cross-border technical collaborations and potential fraud risk scenarios.

Given my extensive, hands-on experience with manufacturing operations, strategic problem-solving, and forensics-level diligence, I submit this critique to highlight the significant deficiencies in T&M's approach to valuing APX York Sheet Metal, Inc.

## Summary of Findings

1. **Lack of Independent Verification**
   T&M concedes it accepted management's numbers "without verification," contradicting standard practices (e.g., AICPA SSVS No. 1, USPAP), especially for contested or fraud-suspected valuations.

2. **Neglect of Asset-Based Floor**
   Despite YSM's heavy capital footprint (e.g., robotic weld cells, fiber-optic

lasers), T&M offers no meaningful asset-based cross-check. This omission likely understates YSM's true value.

3. **Contradictory Handling of Minority Interests & Fraud Allegations**
T&M labels YSM "profitable" yet concedes no distributions flow to Class B shareholders. Conventional discount models are meaningless if controlling owners siphon earnings or systematically deny payouts.

4. **Excessive Disclaimers & Conflict of Interest**
T&M's refusal to defend its conclusions under adversarial scrutiny undermines the report's credibility. Moreover, controlling owners—who stand to benefit from a depressed valuation—commissioned and paid $42,000 for the appraisal, raising serious questions about impartiality.

## Conclusions & Recommendations

- **Forensic-Level Investigation**: Given the numerous red flags (e.g., alleged misappropriations, withheld distributions), a rigorous review of bank records, inter-company transfers, and capital-equipment verification is paramount.

- **Judicial & Trustee Oversight**: Courts and trustees should be cautious in relying on T&M's figures for settlement or motion practice without compelling a transparent, evidence-based revision or alternative valuation.

- **Prudent Cross-Examination**: If T&M's valuation is to be considered, it should be subject to thorough cross-examination, depositions, and documentation requests to test the validity of its assumptions and disclaimers.

## Declaration

I declare under penalty of perjury that the opinions set forth in this critique are based on my professional experience, firsthand observations, and review of pertinent documents. I stand ready to testify or provide further clarification if the Court, trustees, or other stakeholders deem it necessary.

_____

**Andrew William Mulkerin**

MBA, Harvard Business School / BS, Chemical Engineering, Columbia University

Date: March 25, 2025

# 1. Introduction and Context

## 1.1 Purpose of This Critique

This document provides a detailed critique of the Tucker & Meltzer ("T&M") Summary Appraisal Report ("the Report") for APX York Sheet Metal, Inc. ("YSM"), dated December 31, 2023. While T&M purports to have utilized recognized valuation methods, its reliance on unverified data, disregard for crucial asset-based considerations, and misalignment with YSM's actual operational realities call the validity of its conclusions into serious question. Furthermore, the T&M Report explicitly states it was prepared solely for a "contemplated redemption of shares," which does not match the current circumstances of litigation and trust disputes, and there appears to be no engagement letter or project scope clarifying its true purpose.

Moreover, at the time Charles Tiches II procured this Report—ostensibly to value certain business interests—there was neither a trustee nor a distribution adviser in place. This fact should be explicitly noted by the Court, as it raises serious questions about the authority, timing, and purpose behind the commissioning of the reports on which this valuation relies.

Since T&M's stated objective in the Report is so narrowly drawn, it is imperative to ascertain exactly what Mr. Tiches asked T&M to do. Without clarity, the circumstances suggest T&M may have forgone key due diligence steps typically expected of a neutral, professional appraisal—especially given the trust dispute and allegations of financial irregularities.

## 1.2 Role and Qualifications of the Undersigned Expert

• **Academic and Professional Background:**
I completed my BS in Chemical Engineering at Columbia University, where I honed advanced analytical skills—especially in extracting insights from incomplete or complex data and studying boundary-layer phenomena. Today, I apply these principles to business contexts, leveraging the same rigor and precision required in high-stakes engineering. Building on this technical grounding, I earned my MBA from Harvard Business School, which provided specialized training in multiple valuation methodologies (income, market, and asset-based), as well as instruction on spotting potential fraud indicators in corporate financials and

5

managerial behavior. This robust academic foundation is further enhanced by my on-the-ground leadership experience in expansions, turnarounds, mergers, and the strategic growth of advanced manufacturing enterprises.

• **Direct Operational Insight:**

During my tenure as a senior manager at YSM, I oversaw day-to-day operations, from conducting comprehensive asset inspections to managing major capital investments (e.g., advanced fiber-optic lasers and robotic weld cells). In that capacity, I observed both significant value generation and equally concerning financial irregularities that persisted over time.

• **Knowledge of Alleged Irregularities:**

My firsthand familiarity with potential inter-company cash transfers, incomplete disclosures, and multiple discussions with Papoutsis strongly suggested ongoing financial misrepresentations. This unique vantage point enables me to determine whether T&M's disclaimers and valuation methods genuinely address these heightened risks—such as concealed transactions or siphoned earnings—or simply sidestep them by accepting management-provided data at face value.

## 1.3 Overall Concern

T&M's disclaimers repeatedly state that they (1) relied on management's data "without independent verification," (2) limited the scope of their analysis to a narrowly defined purpose, and (3) have no intention of defending their work if challenged. While limited-purpose disclaimers are not unusual, these particular statements raise serious concerns when fraud, misappropriations, and legal disputes have been alleged. If significant financial irregularities or hidden liabilities exist, any appraisal grounded solely on unverified management data becomes inherently suspect.

At Harvard Business School (HBS), we were taught to watch for red flags of potential fraud, and T&M's disclaimers are textbook examples of what can set off those alarms. For a classic case study illustrating how unchecked management data and lack of robust verification can facilitate fraud, see David F. Hawkins, "ZZZZ Best Company, Inc. (A)," Harvard Business School Case No. 9-191-091 (May 1989).

## 2. Overarching Criticisms and Red Flags

### 2.1 Reliance on Unaudited, Potentially Inaccurate Data

### 1. Key Issue

T&M openly acknowledges that it neither audited nor independently confirmed YSM's financial data, relying entirely on management-provided figures. From my direct involvement at YSM and extensive discussions with Papoutsis, I know these financials—along with those of affiliated APX entities—have never been properly audited. Furthermore, frequent changes in accounting personnel and external firms—a recognized red flag for fraud—further raise doubts about the integrity of YSM's reported numbers. The resulting lack of independent oversight significantly elevates the risk of inaccuracies or misrepresentations, undermining any valuation that relies on these unverified inputs.

### 2. Implication

Where financial manipulation, undisclosed liabilities, or off-book transfers may be in play, basing a valuation solely on management-provided data fatally undermines its credibility. From my direct knowledge and interactions with Papoutsis, it is likely T&M was at least aware of the conflict of interest, yet we have no evidence that they probed deeper. In such circumstances, failing to verify the dataset all but guarantees the overlooking of hidden liabilities that can profoundly distort the company's true worth.

### 3. Expert View

Established valuation guidelines (AICPA SSVS No. 1, USPAP, Revenue Ruling 59-60) universally advocate a "reasonableness test," wherein an appraiser must identify and investigate glaring red flags. Given that controlling parties historically refused to distribute profits to a 96% interest, it's incumbent upon any reputable appraiser to scrutinize the authenticity of reported net income and whether controlling owners simply diverted cash. T&M's unquestioning acceptance of unaudited statements constitutes a major oversight, particularly in an environment rife with allegations of malfeasance.

*For an in-depth illustration of how unchecked reliance on management data can mask significant financial fraud, see Krishna G. Palepu, Paul M. Healy, and Suraj*

*Srinivasan, "Accounting Fraud at WorldCom," Harvard Business School Case No. 9-104-071 (2004).*

## 2.3 Ignoring or Downplaying the Possibility of Fraud

### 1. Contradiction

T&M openly acknowledges that YSM's minority shareholders have historically seen little or no actual return, yet it applies "lack of marketability" and "lack of control" discounts as though those stakeholders could reasonably expect typical distributions or eventual economic gain. Here's why that approach is so problematic:

- **Misplaced Assumptions:**
  Traditional valuation discounts for lack of marketability and control presume some baseline level of shareholder benefit—at minimum, the potential for dividends, distributions, or capital appreciation. When T&M admits distributions have been negligible (or nonexistent), it undermines the assumption that minority holders stand to receive meaningful returns. By applying a boilerplate "lack of control" discount to YSM's minority-interest shares, T&M fails to consider that the Class B interest may generate little to no actual returns—effectively reducing its intrinsic value to near zero. From my direct experience, it appears that Papoutsis and others are attempting to exploit the structural restrictions embedded in the Class B stock's bylaws— created and endorsed by Wilmington Trust and Barley Snyder—to obscure the reality of massive fraud and subsequent cover-up. While these parties insist that the Bylaws' limitations justify a low valuation, that argument loses force when confronted with credible allegations that the controlling parties never intended to release distributions in the first place.

- **Ignoring Warning Signs:**
  In a scenario where YSM issues no distributions and may be burdened by undisclosed liabilities or operational irregularities, a truly prudent appraiser would perform a thorough investigation rather than reflexively assigning standard discounts. By failing to examine whether YSM's Class B stake has any reliable future economic value—and if not, what that implies from a legal standpoint—T&M's approach overlooks the very conditions that demand deeper scrutiny or an outright reappraisal.

8

- **Fraud Risk Exacerbates the Problem:**
  When allegations of fraud, misappropriation, or disputed ownership and cash transfers abound, unverified financial data becomes an even greater liability. If YSM's actual cash flow is inaccurately reported or siphoned, then any discount model predicated on "business as usual" and standard minority protections is not just incomplete—it is fictional. Under those circumstances, T&M's application of routine discount factors only serves to magnify the disconnect between the reported valuation and YSM's true financial condition.

- **Undermined Credibility:**
  By sticking to a standard "lack of control" discount, T&M undercuts its own admission that Class B shareholders receive minimal (if any) distributions, effectively ignoring the heightened risk inherent in alleged fraud or mismanagement. A lack-of-control discount is typically meant to capture the inability of minority holders to direct corporate decisions, not the near-total absence of tangible returns caused by potential malfeasance. When T&M downplays the gravity of these allegations—particularly in violation of recognized guidelines such as AICPA SSVS No. 1, the Uniform Standards of Professional Appraisal Practice (USPAP), and NACVA standards—its final valuation figure must be viewed with pronounced skepticism. Under each of these authoritative frameworks, the presence of red flags like unverified data and zero distributions mandates increased diligence, not a routine discount analysis that assumes "business as usual."

### Core Concern

If controlling owners divert or retain all earnings—effectively rendering a minority interest (e.g., Class B stock) worthless—standard discount factors (for instance, 10% for lack of control and 25% for lack of marketability) fail to account for the stark reality that the shareholder may never receive a single distribution. This scenario raises serious concerns about constructive fraud, particularly in light of the bylaws, trust documents, and beneficiary agreements that Papoutsis himself acknowledged were deliberately structured—by Wilmington Trust and its network of affiliated attorneys—to protect the interests of the grantors while providing minimal guarantees or enforceable rights to the beneficiaries.

## 2. Expert View

Traditional minority-interest discount theory assumes at least some potential for economic benefit—whether from dividends, a capital event, or the ability to sell shares at fair value. But when distributions are perpetually withheld, or funneled away by controlling parties, the notional value of the minority stake can be illusory or even nonexistent. In such cases, applying an off-the-shelf "minority discount" is a gross oversimplification. It overlooks the possibility that, due to alleged misappropriation and structurally designed constraints, a minority stake in YSM may be essentially valueless—thereby rendering the appraisal's conclusions inaccurate and inadequate.

*For a parallel illustration of how corporate structures and opaque management practices can mask or facilitate financial improprieties, see Paul M. Healy and Krishna G. Palepu, "The Fall of Enron," Harvard Business School Case No. 9-101-088 (2003).*

### 3. Inadequate Treatment of YSM's True Asset Base

### 3.1 Significant Capital Equipment and Barriers to Entry

### 1. Facts

YSM has invested millions into advanced manufacturing assets—fiber-optic laser cutters, CNC press brakes, continuous powder-coat lines, and robotic weld cells— that carry both significant liquidation or replacement value and confer a formidable competitive advantage. Reproducing such a sophisticated operation would require massive capital expenditures by any rival, effectively creating a competitive moat. When factoring in the high barriers to entry for similar technologies, it becomes clear that these substantial assets ought to command a critical role in any thorough valuation—one that T&M's cursory analysis appears to undervalue.

### 2. Omission

Despite YSM's substantial investment in specialized, high-value manufacturing equipment, T&M's Report devotes its attention primarily to negligible items such as "office furniture," "computers," and "leasehold improvements." By failing to examine or even acknowledge the essential machinery that drives YSM's revenue and competitive edge, T&M effectively bypasses a major portion of the company's tangible, monetizable value. In a manufacturing context—especially one as capital-intensive as YSM—assets like fiber-optic lasers, CNC press brakes, and robotic weld cells often represent the lion's share of both the firm's current worth and its future earning capacity. By omitting an in-depth evaluation of these critical resources, T&M overlooks not just a substantial liquidation value but also the operational efficiencies and market advantages that help distinguish YSM from competitors. Consequently, any valuation derived from such an incomplete assessment will be inherently unreliable and likely understate YSM's true economic potential.

### 3. Expert View

A proper valuation of a capital-intensive manufacturing enterprise must do more than just apply an income approach; it also needs to cross-verify that conclusion with an asset-based "floor." By excluding YSM's substantial, specialized machinery—fiber-optic lasers, CNC press brakes, continuous powder-coat lines, and robotic weld cells—from its analysis, T&M not only disregards an enormous portion of the company's tangible worth but also overlooks the competitive moat

these assets create. Having led YSM and overseen its team and facilities—though notably excluded from full access to the financial back end—I witnessed firsthand the millions of dollars invested in advanced equipment. These machines formed a core pillar of YSM's operational capability. Their omission from the valuation, especially in the context of ongoing allegations of fraud and asset misappropriation, suggests that T&M's final figure may have been deliberately minimized. The result is a valuation that almost certainly understates YSM's true economic potential.

## 3.2 Justification for Skipping the Asset-Based Approach

### 1. T&M's Rationale

T&M attempts to justify dismissing an asset-based analysis by pointing to YSM's superficial "profitability." In a standard, low-risk scenario—where comprehensive audits and transparent financial statements exist—focusing primarily on income-based methods could be defensible. However, these are not ordinary circumstances: T&M acknowledges minimal or nonexistent distributions, while extensive allegations of undisclosed liabilities, cross-entity transfers, and possible misappropriation strongly suggest that YSM's stated "profits" may be incomplete or distorted. Merely labeling YSM as "profitable" offers no guarantee that the reported figures align with actual performance—particularly in light of allegations of withheld distributions, inter-company transfers, and possible misappropriation. This risk makes a comprehensive cross-check against the company's substantial tangible assets all the more essential to establish a realistic "floor" valuation. When a central component of standard valuation practice is deliberately omitted, it signals either gross oversight or a potentially intentional strategy to obscure the true extent of YSM's value.

### 2. Counterargument

In capital-intensive industries, where sophisticated equipment directly drives revenue, an asset-based valuation is more than just a recommended best practice—it is indispensable. Even if YSM appears profitable on paper, those numbers can be artificially suppressed through undisclosed liabilities, siphoned cash, or outright governance failures. By skipping the hard-value "floor" that an asset-based cross-check would establish, T&M effectively leaves the door open for significant

underestimation of YSM's worth—precisely the sort of undervaluation that can arise when critical assets are ignored or deliberately concealed.

### 3. Risk of Understatement

If the resale or replacement cost of YSM's machinery alone approaches—or even exceeds—T&M's final equity figure, it conclusively proves that T&M has undervalued the company. In a scenario rife with allegations of financial misconduct, the choice not to run an asset-based analysis is indefensible. It is far more than an oversight: it strongly suggests the valuation is engineered to yield an artificially low figure, potentially aiding in fraudulent misrepresentations of YSM's worth.

## 4. Questionable Application of the Income and Market Approaches

### 4.1 Income Approach Flaws

### 1. Unverified Normalized Earnings

T&M bases its valuation on management's "adjusted" earnings figures, yet makes no serious effort to verify whether hidden transactions, inflated overhead, or undisclosed revenue streams might be skewing the numbers. Notably, entire business divisions shuttered unexpectedly, and inventory levels and newly created "inter-company loans" spiked without plausible explanation. While a degree of inventory fluctuation is typical in manufacturing, my firsthand observations over several years at APX reveal swings so dramatic as to imply deeper systemic problems. By ignoring these anomalies, T&M fails to address crucial risk indicators that could wholly undermine its "normalized" earnings analysis.

Worse, in over a dozen conversations, Papoutsis personally admitted to reclassifying assets and liabilities at will—evidence of a pervasive, deliberate distortion that heightens the odds T&M's valuation is anchored in selectively presented or even fabricated data.

### 2. Omission of Volatile Periods

T&M acknowledges that YSM experienced significant financial volatility but inexplicably dismisses certain "unusual" results without offering any substantive rationale—implicitly attributing them to short-term operational hiccups rather than considering the possibility of siphoned funds or artificially inflated expenses.

Instead of probing these irregularities in detail, T&M appears to rely on vague management assurances—an especially glaring oversight given the unaudited statements, the risk of fraud, and T&M's refusal to defend its work under legal scrutiny.

### 3. Omissions Exceed "Poor Form"

From my extensive discussions with Papoutsis and on-the-ground familiarity with YSM's financial ebbs and flows, T&M's approach points to either willful negligence of glaring warning signs or a strategic effort to hide questionable accounting. Alleged misappropriations, invisible liabilities, and repeated anomalies demand a higher standard of vigilance. Simply put, no credible valuation expert

would gloss over such critical markers if the objective were a rigorous, defensible result.

## 4. An Indefensible Methodology

T&M's selective exclusion—or outright minimization—of pivotal data, casts serious doubt on the legitimacy of its conclusions. Having reviewed YSM's daily records and spoken repeatedly with Papoutsis, I found T&M's methods so unconvincing that I would, under normal circumstances, have stopped reading long before reaching the end. Although I admit my own stake in a debtor-favorable result, T&M's blatant lack of due diligence and verification renders its analysis not just flawed but indefensible.

## 5. Working Capital Deficit

Compounding these flaws is T&M's unexplained deduction of an $842,000 "shortfall," despite the fact that YSM's working capital had been routinely diverted to other APX entities absent proper documentation. In speaking with APX Companies company official Raymond Miller, CPA—YSM's former accountant— he confirmed that APX companies did not adhere to GAAP (at Papoutsis's insistence), which made him ethically uneasy, though he lacked the resolve to act. Only when Eileen Green assumed the CFO role in fall 2021 and RKL was brought in to "clean up" the books did any meaningful corrections take place—most likely triggered by fears that I would shine a light on those inconsistencies. I repeatedly raised these concerns publicly at an executive level—directly with Papoutsis, but also with internal financial personnel, including Garrett Gordon, CPA, Jim Rowan, CPA, and Charles Tiches II—yet saw no substantive remedial action.

T&M's inadequate disclosure of the working capital shortfall—combined with the ongoing absence of GAAP-compliant accounting—severely erodes the credibility of T&M's final adjustments. A potentially last-minute scramble to "fix" the ledger just as legal disputes loomed only reinforced the view that T&M's working capital reconciliation was deliberately superficial—likely designed to mask deeper financial irregularities and, in some cases, potentially criminal conduct. Notably, at no point was a legitimate audit performed that would satisfy AICPA, NACVA, or any recognized accreditation standards—an egregious lapse, given the multiple red flags and alleged fraud. Under AICPA SSVS No. 1 and other professional

15

guidelines, relying solely on unverified, management-provided data when potential misconduct is evident not only fails to meet minimal due-diligence benchmarks.

## 4.2 Market Approach Concerns

T&M's application of the market approach suffers from serious methodological flaws that materially undermine the reliability of its conclusions. Most notably, the firm relies on generic comparables and outdated discount benchmarks without adequately accounting for YSM's specific operational profile, modern capital structure, or intercompany dynamics.

### 1. Use of Irrelevant Comparables and Outdated Benchmarks

T&M cites various database transactions as market comparables but fails to demonstrate whether the referenced companies actually resemble YSM in any meaningful way. There is no discussion of how these supposed "comps" match YSM in terms of capital intensity, technological sophistication, or the strategic synergies created through its alignment with other APX affiliates. Without such context, the conclusions drawn from these benchmarks are highly suspect and potentially misleading.

Compounding this, T&M defaults to discount metrics derived from decades-old restricted-stock studies—namely a 25% "lack of marketability" figure—without considering whether such figures are appropriate for a manufacturing firm like YSM, which has substantial hard assets, growing customer relationships, and complex affiliate structures. In a context that may involve undisclosed assets, liabilities, or alleged fraud, applying outdated benchmarks without adjustment does not just risk inaccuracy—it facilitates a distorted or even deliberately minimized view of YSM's real value.

### 2. Failure to Conduct a Site Visit or Operational Review

In capital-intensive businesses, on-site operational review is a basic, expected step in credible valuation. T&M's failure to conduct any site visits or physically inspect YSM's advanced manufacturing equipment—including fiber-optic lasers, robotic weld cells, and continuous powder-coat lines—signals a lack of diligence. Moreover, T&M ignores the synergistic value created through YSM's relationships with sister APX entities specializing in precision machining, aluminum enclosures,

and surface treatment—all of which directly impact margins and market positioning.

By omitting this operational and structural context, T&M's market-based conclusions rest on assumptions that may be fundamentally disconnected from reality.

### 4.3 Stacking Discounts for Control and Marketability

**1. Standard Textbook Approach**

T&M employs a generic "discount stack" for minority interests—10% to account for the shareholder's inability to control corporate decisions and 25% to reflect the illiquidity of shares in a private company. These percentages, drawn from commonly cited restricted-stock and minority-interest studies, assume a normal corporate environment in which minority shareholders at least have baseline protections—such as the right to receive dividends if declared, access to financial records, and potential legal remedies in the event of malfeasance.

Yet nothing about YSM's governance structure fits this "normal." Based on Harvard Business School teachings, we see a classic case of how standard discounting methods can become a smokescreen for deeper issues, effectively "laundering" potentially manipulated data into an illusion of legitimacy. When T&M applies a standard discount to questionable or incomplete inputs—like withheld distributions or mislabeled inter-company loans—the end product is a highly suspect valuation figure, hiding the context of alleged fraud and unethical accounting.

**2. Misalignment with Fraud Allegations**

In a scenario where controlling owners show no intention of distributing profits or allowing a minority exit, off-the-shelf discounts of 10% and 25% fall woefully short. They do not capture the possibility that minority shareholders may never see a penny of dividends or be able to force an equitable buyout. Claiming a per-share value of $201.49 down to the cent is an exercise in false precision, especially when underlying data remains unverified and the governance structure is demonstrably suspect. If management truly is siphoning cash or suppressing distributions, the "marketability" discount is beside the point—no real market exists for shares that produce zero returns and lack enforceable rights.

17

### 3. Expert Note

In real-world contexts of alleged embezzlement, fraudulent conveyances, or manipulated overhead, the minority stake can become functionally worthless. Absent enforceable remedies—like guaranteed dividend payouts or forced buyouts—an "official" discount figure means little. If anything, the presence of fraud and governance irregularities might merit a much higher discount than 25%—or even a conclusion that the interest holds no tangible value.

*For a cautionary parallel where corporate malfeasance and governance lapses invalidated seemingly "standard" valuation metrics, see Jay W. Lorsch, "Tyco International (A): Corporate Governance," Harvard Business School Case No. 9-109-037 (2009).*

## 5. Additional Concerns Undermining Report Integrity

### 5.1 Limiting the Report's Purpose and Refusing to Defend It

### 1. Narrow Objective

T&M confines its Report to a singular, narrowly defined scenario—what it calls a "contemplated redemption"—while explicitly refusing to defend its conclusions if the Report is introduced in litigation or subjected to rigorous legal scrutiny. This is especially revealing given that the attorneys—Atlas, Carr, and Chernicoff—intend to use T&M's valuation precisely for purposes T&M purports to exclude.

From a professional valuation standpoint, such a disclaimer is highly unusual and suspect. Under AICPA SSVS No. 1 and USPAP guidelines, transparency in the scope and intended use of a valuation is fundamental, especially where fraud or contested proceedings are at issue. In fact, Harvard Business School case studies repeatedly warn of disclaimers that attempt to cordon off or preempt the very legal scrutiny valuations typically undergo in adversarial contexts—there is often a reason behind such disclaimers that goes well beyond standard boilerplate.

By insulating themselves from cross-examination and discovery, T&M effectively signals two possibilities:

- They recognize the inherent weaknesses in their analysis and seek to limit legal challenges.

- They are unwilling (or unprepared) to defend the underpinnings of the Report under oath, a red flag in any contested valuation environment.

Either scenario contradicts the expected duty of care for a valuation intended—or likely—to be used in legal or fiduciary disputes. If T&M's findings are so brittle that the firm refuses to stand behind them in court, one must question whether the valuation meets even the most minimal professional standards. HBS casework and relevant case law (e.g., the *Daubert* standard in the federal judiciary) make clear that a valuation lacking rigorous foundation—coupled with disclaimers that bar legal challenge—undermines its credibility and functional relevance.

In short, no reputable appraiser delivering a thorough, defensible product would disclaim accountability in the precise circumstances (litigation, fiduciary disputes, etc.) where a credible valuation matters most. T&M's disclaimers to the contrary

strongly suggest they either see major defects in their methodology or simply do not want those defects to be exposed in a court of law.

## 2. Critical Litigation Context

In trust disputes, bankruptcy proceedings, or fraud allegations, valuations must typically withstand cross-examination or at least the reasonable prospect of it. T&M's broad disclaimers significantly undermine the credibility of its conclusions when presented in an adversarial setting. By contrast, I stand prepared to testify in detail—at length and with full transparency—if the court deems it necessary, consistent with the spirit of fair judicial process.

## Potential Appearance of "False Precision"

1. **Decimal-Exact Conclusion**

   T&M assigns a per-share value of $201.49, projecting an unwarranted degree of exactness—particularly given the firm's own disclaimers about relying on unverified data. Claiming penny-level precision in such a contentious environment can create a misleading aura of methodological rigor, implying a robust analytical process where none may actually exist.

2. **Implication**

   My experience leading Nicobar Group in China's heavy industry and advanced commercial nuclear sectors taught me that seemingly precise figures often conceal significant data-quality issues. Although some Chinese enterprises maintain multiple sets of books or employ creative accounting, they still must deliver verifiable results—for instance, exact tolerances or chemical compositions validated through real-world tests. This dual reality—where polished spreadsheets may contradict on-the-ground truths— highlighted how vital it is to verify every decimal.

The same principle applies to T&M's $201.49 valuation. Without auditable, real-world support, that level of detail is illusory. When internal finances are in question or multiple records might exist—whether in state-owned factories or YSM's allegedly conflicted operations—hands-on verification and hard data are far more probative than a neat, two-decimal figure. No matter how impressive the number appears, it cannot replace the rigor of site visits, bank reconciliations, and cross-entity analysis to determine whether YSM's purported value aligns with reality.

### 6. Summation of Key Observations

1. **No Independent Verification of Critical Data**
   T&M explicitly admits that it took management's financial statements at face value, performing no independent verification. In a contested valuation—especially one involving suspected fraud—this lack of skepticism violates fundamental appraisal standards and undermines the reliability of the valuation at its very core.

2. **Neglect of the Asset-Based Approach Despite a Large Capital Footprint**
   By omitting any meaningful asset-based analysis, T&M likely understates YSM's true worth, leaving a significant blind spot in its final report. Given YSM's substantial investments in advanced manufacturing equipment, this omission is both glaring and unjustifiable.

3. **Contradictory Handling of Minority Interests and Fraud Possibilities**
   T&M labels YSM "profitable" yet concedes that no distributions ever reach Class B shareholders. Standard discount models typically assume at least the potential for dividends or exit opportunities—an assumption effectively nullified here.

   Moreover, if major actors are concealing fraud, the Debtor's estate may be entitled to large-scale damages—assuming decisive legal action compels full disclosure. From an expert perspective, abandoning or prematurely settling that avenue is perplexing. The valuation process is so mired in dubious assumptions and overlooked red flags that it defeats the fundamental goal of fiduciary diligence.

4. **Excessive Boilerplate Disclaimer**
   By refusing to defend its analysis, T&M essentially admits its Report was never intended for adversarial scrutiny—a stance that immediately undermines the valuation's credibility. T&M appears to recognize the vulnerabilities of its own conclusions.

5. **Conflict of Interest**
   The controlling parties, who have a clear incentive to depress YSM's valuation, paid T&M $42,000 to produce the report. This funding source raises inherent conflicts that T&M does not appear to have mitigated or

disclosed in a manner consistent with established professional and ethical standards.

## 7. Conclusion and Recommendations

### 7.1 The Report's Unreliability and Legal Infirmity

Tucker & Meltzer's ("T&M") valuation report is fundamentally flawed. It is riddled with broad disclaimers, anchored in unverified data, and devoid of credible operational or forensic analysis. These defects are not minor technical oversights—they render the report unfit for use in any adversarial proceeding, especially one involving allegations of fraud, contested ownership, and fiduciary misconduct. The report's central conclusion—YSM's fair market value—is rendered meaningless by its failure to examine the operational and financial realities underlying the company's numbers. Where governance is opaque, distributions are withheld, and fraud is alleged, any valuation based on unchecked assumptions must be treated with suspicion.

### 7.2 Recommendations

To resolve the value of YSM in a way that meets legal, ethical, and fiduciary obligations, stakeholders must commission a full forensic valuation, incorporating:

- **Site Visits**: Physical verification of all major capital assets, including logs, serial numbers, maintenance records, and firsthand observations to confirm that equipment is present, operational, and as represented.

- **Bank Reconciliations**: Comprehensive tracing of cash flows and transfers among APX-affiliated entities to identify hidden transactions, off-book liabilities, or questionable internal accounting.

- **Intercompany Transaction Mapping**: A clear and documented understanding of how APX entities shift revenue, expenses, and assets across entities to identify whether YSM's financials are inflated or suppressed.

- **Governance and Control Review**: Evaluation of shareholder rights, bylaws, board minutes, and trust documents to determine whether the Class B interest holds any enforceable rights or is functionally worthless due to structural manipulation.