UNITED STATES BANKRUPTCY COURT MIDDLE DISTRICT OF PENNSYLVANIA

In re:

IRENE MULKERIN, Debtor

Case No.: 1:24-bk-03264-HWV

Chapter 7

FILED
**May 23, 2025**
Clerk, U.S. Bankruptcy Court
Middle District of Pennsylvania
Wilkes-Barre

DECLARATION OF IRENE MULKERIN REGARDING COERCION IN EXECUTION OF SETTLEMENT TERM SHEET

I, Irene Mulkerin, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Debtor in this matter and submit this declaration in further support of my Motion to Release or Apply Escrow Funds (Dkt. 190).

2. Throughout every version of settlement negotiations that occurred between April and August 2024—including multiple different structures and drafts—I consistently and unequivocally insisted that any upfront deposit made to me must be non-refundable. I made this position clear to my then-counsel, Daniel Atlas, and to the opposing parties through him.

3. My insistence on a non-refundable deposit was based on my deep and well-founded distrust of the parties involved in the settlement. I did not believe they were acting in good faith, and the only way I could feel protected entering into any settlement was to secure a non-refundable deposit as a demonstration of seriousness and financial commitment.

4. On August 7, 2024, I reviewed a draft of the Settlement Term Sheet reflecting this understanding—that the $150,000 deposit was to be non-refundable (Exhibit A). I agreed to that version because it honored the terms I had consistently demanded as a condition of any deal.

1

5. On August 8, 2024 I was informed by my counsel that Wilmington Trust "is on board."

6. On the evening of August 14, 2024—after several days in which my attorney had unsuccessfully tried to obtain an update from Matt D'Emilio (counsel for Don Kornfield and coordinator of the settlement)—I received a revised version of the Term Sheet. Although it appeared to reflect our agreed-upon structure, it included a major change: the $150,000 deposit was now listed as refundable to Wilmington Trust if the settlement did not close. I immediately and adamantly objected, as this contradicted months of prior agreement and my repeated insistence that the deposit must be non-refundable.

7. Despite clearly telling my attorney, Daniel Atlas, that I would not agree to the revised terms and that there was nothing left to discuss, he continued to pressure me over the next two days. On August 16, 2024, he pushed me to join a call that I was told would include Jeff Dailey. Instead, I was met by Mr. Atlas and Andrew Saunders, a partner at Dailey LLP.

8. On the call, Atlas and Saunders informed me that D'Emilio was "moving mountains" to get this done. They represented that Wilmington Trust had already signed the Term Sheet and that reverting the escrow deposit back to non-refundable would cause a delay of at least two to four weeks, and prevent me from getting paid by September 30, 2023.

9. Atlas and Saunders represented that there was "no change to the overall economics" for me, and that WTC's signing of the settlement agreement was the real "driving factor to close the deal" and I should believe that to be "as good as" a non-refundable deposit.

10. My repeated objections were ignored and I was led to believe that any change would require Wilmington Trust to go back through internal approval

processes, which would jeopardize timing and ultimately prevent me from keeping my home out of foreclosure — which was my highest priority.

11. By the end of the call, I received the overwhelming message was that I would lose the chance to get paid in time to prevent foreclosure and stabilize my financial situation if I did not sign it.

12. Throughout the settlement negotiations, my attorney, Daniel Atlas, repeatedly told me that if I did not follow his recommendations or accept the proposed settlement terms, I would be left with nothing. At various points, he warned that his firm would require him to withdraw as my counsel if I refused to settle. These warnings intensified the pressure I felt and made me fearful that I would have no legal support or pathway forward.

13. Despite my deep conviction that signing was a mistake—and my overwhelming fear that I was giving away the only leverage I had to secure relief from individuals I did not trust—I ultimately signed the Term Sheet on August 19, 2024, under extreme duress. I believed I had no real alternative to protect my family and save our home. I was so ashamed of what I'd agreed to that I didn't tell anyone for over a week.

14. I respectfully request that the Court consider this declaration as part of the evidentiary record in support of my Motion to Release or Apply Escrow Funds, and as further proof of the coercion, manipulation, and lack of good faith surrounding the execution of the Settlement Term Sheet and related escrow arrangement.

Executed on May 23, 2024.

/s/ Irene Mulkerin
|Irene Mulkerin
Debtor, Pro Se

# EXHIBIT A

*Mulkerin v. Wilmington Trust Co., et al*
C.A. No. 2023-1237-BWD

---

**Draft Settlement Term Sheet (<u>Mulkerin Proposal</u>)**

---

This Settlement Term Sheet sets forth all of the material terms of the parties' agreement and is subject to the parties' execution of a final settlement agreement with standard terms (the "Settlement Agreement"), which will be prepared by counsel to Don Kornfield ("Kornfield") for the parties' review and approval.

1. The Settlement Agreement will include the following parties, and this Settlement Term Sheet shall be signed by each of the following parties:

    a. Wilmington Trust Company ("Wilmington Trust"), in its capacity as prior trustee of the trust (the "Trust") created under the Deed of Trust dated December 13, 2012 between Andrew V. Papoutsis ("Papoutsis") and Wilmington Trust (the "Trust Agreement");

    b. Papoutsis, in his capacity as the Trust's Grantor and Investment Adviser, as defined in the Trust Agreement;

    c. Irene Mulkerin ("Irene"), in her capacity as a beneficiary of the Trust;

    d. Laura Paddack ("Laura"), in her capacity as a beneficiary of the Trust;

    e. Jamie L. Papoutsis ("Jamie"), in her capacity as a beneficiary of the Trust;

    f. Bradley J. Leber ("Leber"), in his capacity as Trust Protector and Distribution Adviser of the Trust, as defined in the Trust Agreement; and

    g. Kornfield, in his capacity as successor trustee of the Trust.

2. <u>Financing Process</u>

    a. To create liquidity to fund the Settlement Agreement and decant the Trust, Kornfield, in his capacity as trustee, will borrow [$-] million, and will pledge the stock in APX Enclosures, Inc., APX Industrial Coatings, Inc., APX Mitchell Shop, Inc., and APX York Sheet Metal, Inc. (the "APX Operating Entities") and the life insurance policy owned by the Trust as collateral (the "Note").

    b. Promptly after the execution of this Settlement Term Sheet, but before the execution of any Settlement Agreement, Kornfield will provide Irene written proof that Kornfield has begun the financing process of securing the Note to fund the Settlement Agreement.

    c. Promptly after the execution of this Settlement Term Sheet, but before the execution of any Settlement Agreement, Irene shall also receive from Kornfield a written timeline confirming the timing of the Note's financing.

3. <u>Initial Payment</u>

    a. Kornfield, on behalf of the Trust, must make a non-refundable deposit of $150,000 to Irene by close of business on August 12, 2024 (the "Initial Payment"). The payment will be made, upon receiving wiring instructions, into an escrow account established by Irene's counsel (the "Escrow Account').

4. Papoutsis will declare 2 new trusts (the "Decanting"), one for Laura and one for Jamie (each, the "Decanted Trusts").

5. The trust agreements governing the Decanted Trusts will be identical to the Trust Agreement as if Papoutsis were deceased except:

    a. With respect to each of the Decanted Trusts:
        i. Kornfield will serve as the initial trustee;
        ii. Leber will serve as the initial Trust Protector and Distribution Adviser; and
        iii. Papoutsis will serve as initial Investment Adviser.

6. Kornfield, in his capacity as successor trustee, upon the direction of Leber, will exercise his discretion pursuant to 12 *Del. C.* § 3528 to decant the Trust as follows:

    a. Kornfield will distribute the following assets to each of the Decanted Trusts:
        i. 1/2 of the stock in the APX Operating Entities;
        ii. 1/3 of the cash in the trust immediately prior to receipt of the loan proceeds;
        iii. 1/2 of the Insurance policy;
        iv. 4,950 shares of APX Companies; and
        v. 1/2 of the Note.

    b. Within three (3) business days of the execution of the Settlement Agreement, Kornfield will distribute an additional $3.0 million into the Escrow Account (the "Second Payment").

7. Upon confirmation of receipt of the Second Payment, Irene will dismiss the Amended Complaint without prejudice within one (1) business day (the "Amended Complaint Dismissal").

8. Within one (1) business day of receiving confirmation of the Amended Complaint Dismissal, the APX Operating Entities will dismiss their Writs of Summons (to be defined in Settlement Agreement) (the "PA Dismissal").

9. Papoutsis represents and warrants that:

    a. The stock for the "APX Companies" listed in the Trust's Wilmington Trust's financial statements have no value, as that entity was created to be a holding company for other APX-related entities, but that holding company was never created.

    b. The Trust owns no other economic or stockholder interest in any other APX-related entity (other than those previously defined as the "APX Companies").

    c. Papoutsis has the authority to (i) execute this Settlement Agreement on behalf of each of the APX Companies and (ii) effectuate the PA Dismissal on behalf of the APX Operating Entities.

    d. The accuracy of the APX Companies' financial statements.

10. General remedy provision

11. The parties will exchange mutual releases which will foreclose any and all claims in connection with the claims outlined in the Amended Complaint in Delaware (C.A. No. 2023-1237-BWD (Del. Ch.)) and the administration of the Trust to date, except that the release will not apply to the Initial and Second Payment and representations and warranties stated herein.

12. The parties will bear their own attorneys' fees and expenses.

13. The settlement agreement will be governed by Delaware law.

14. Exclusive jurisdiction for any claim arising out or relating to the settlement agreement shall be brought in the Delaware Court of Chancery.

[signature page to follow]