**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 7 |
| IRENE PAPOUTSIS MULKERIN, | : | |
| | : | CASE NO. 1:24-bk-03264-HWV |
| Debtor | : | |
| | : | |
| STEVEN M. CARR, as CHAPTER 7 | : | Contested Matter: Motion to Approve |
| TRUSTEE, | : | Compromise Pursuant to Federal Rule of |
| | : | Bankruptcy Procedure 9019 |
| Movant, | : | |
| | : | |
| IRENE PAPOUTSIS MULKERIN, | : | |
| | : | |
| Respondent. | : | |

## MEMORANDUM OPINION

This matter comes before the Court on the Motion of the Chapter 7 Trustee, Steven M.

Carr (the "Trustee"), to approve a compromise of litigation claims under Federal Rule of

Bankruptcy Procedure 9019 ("Rule 9019"). In his Motion, the Trustee seeks approval to settle

claims initially asserted pre-petition by the Debtor, Irene Mulkerin, against the Andrew V.

Papoutsis Irrevocable Trust, of which the Debtor is a discretionary beneficiary. The Debtor

objects to the proposed compromise, arguing that it undervalues the claim and is not in the best

interest of the estate.

For the reasons set forth below, the Court finds the proposed compromise, as described in

the Settlement Term Sheet ("Term Sheet"), the Trustee's Written Report in Support of

Compromise of Claim ("Trustee's Report"), and the hearing record, satisfies the standards for

approval under Rule 9019 and *Myers v. Martin* (*In re Martin*), 91 F.3d 389 (3d Cir. 1996), and

reflects a sound exercise of the Trustee's business judgment under applicable law. However,

because the final settlement agreement contemplated by the Term Sheet has not yet been

executed or submitted, the Court's approval is expressly conditioned on the Trustee's submission of a fully executed agreement that materially conforms to the settlement terms described in the record, as further detailed below. Subject to this condition, the Trustee's Motion will be granted.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Standing Order of Reference of the United States District Court for the Middle District of Pennsylvania dated March 11, 2011. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In December 2012, Andrew V. Papoutsis ("Mr. Papoutsis") established the Andrew V. Papoutsis Irrevocable Trust (the "Trust") for the benefit of his three daughters, one of whom is the Debtor, Irene Papoutsis Mulkerin. (Trust Document, Doc. 189-1, p. 1 ("Trust"); Amended Complaint, ¶ 24, Doc. 189-2, p. 10 ("Am. Compl.").)[1] The Trust is governed by Delaware law, contains a spendthrift clause, and permits its trustee to distribute income or principal in the trustee's discretion, subject to the direction of a distribution adviser. (Trust §§ 1(F), 5, 19, pp. 3–5, 14.) The Trust's principal assets consist of non-controlling, non-voting Class B shares in four closely held business entities—APX Enclosures, Inc.; APX Industrial Coatings, Inc.; APX York Sheet Metal, Inc.; and APX Mitchell Machine Shop, Inc. (collectively, the "APX Companies")—all of which are controlled by Mr. Papoutsis through his ownership of Class A voting shares.[2] (Trustee's Report, Doc. 189, p. 1 ("Trustee's Rpt."); Am. Compl., pp. 15–16.) The Class B shares are illiquid and difficult to value, and the Debtor has historically faced challenges

---

[1] For ease of reference, and where appropriate, the Court utilizes the page numbers from the CM/ECF footer.

[2] In addition, the Trust contains minor assets, including small amounts of cash, a life insurance policy, and shares in the Wilmington U.S. Government Money Market Fund. (Am. Compl., p. 15; Mar. 26 Tr. 49:6–10.)

2

in obtaining reliable valuation information from the Trust and its representatives. (*See* APX Industrial Coatings Valuation Report, Doc. 189-3; APX York Sheet Metal Valuation Report, Doc. 189-4; APX Mitchell Machine Shop Valuation Report, Doc. 189-5; APX Enclosures Valuation Report, Doc. 189-6 (collectively, the "APX Company Valuations"); *see also* Am. Compl., pp. 3–6, 13, 23.) Although she was named as a beneficiary from the outset, the Debtor did not immediately receive a copy of the Trust documents and has never been provided with the accompanying Schedule A detailing the assets contained in the Trust corpus. (Am. Compl., pp. 13, 23.) Separate from her beneficial interest in the Trust, the Debtor also holds a 32% limited partnership interest in a family-owned real estate entity, known as the Family Limited Partnership ("FLP"). (Trustee's Rpt., pp. 9–10.) The FLP is not part of the Trust corpus and is organized under a partnership agreement that names the Debtor's father, Andrew V. Papoutsis, as general partner. (*Id.* at 9.)

In late March 2023, the Debtor received a copy of the Trust documents for the first time. (Am. Compl., p. 23.) In the months that followed, she made several informal requests for distributions, some of which were granted while others were denied.[3] (*See* Debtor's Amended Motion to Compel Distributions ("Am. Mot. to Compel"), Exhibit B, Doc. 56, pp. 41–46; Trustee's Rpt., p. 1.) Upon further review of the Trust documents, the Debtor concluded that Mr. Papoutsis had misled her about the nature and extent of her rights under the Trust and that prior denials of her distribution requests may have been improper. (Am. Compl., pp. 5–6; Transcript of April 3, 2025 Hearing on Motion to Approve Compromise, Doc. 327 ("Apr. 3 Tr."), 17:14–19, 24:14–22, 25:14–17, 29:19–24.) As a result, she filed a *pro se* complaint in December 2023 in

---

[3] Wilmington Trust Company served as trustee for the Trust during part of the time period that the Debtor requested Trust distributions. (Am. Compl., pp. 8, 23, 28; Transcript of April 3, 2025 Hearing on Motion to Approve Compromise, Doc. 327 ("Apr. 3 Tr."), 31:21–32:4, 36:4, 42:1–4.)

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 3 of 44

the Delaware Court of Chancery, asserting claims against Wilmington Trust and Mr. Papoutsis for mismanagement of trust assets, lack of transparency, breach of fiduciary duty, and fraud (the "Delaware Chancery Court Litigation"). (*See* Am. Mot. to Compel, Ex. C, pp. 48–56.) Her complaint sought both damages and injunctive relief. (*See id.*)

On March 22, 2024, the Debtor retained Attorney Daniel Atlas ("Attorney Atlas") of Dailey LLP to represent her in the Delaware Chancery Court Litigation. (Trustee's Rpt., Doc. 189, p. 2; Transcript of March 26, 2025 Hearing on Motion to Approve Compromise, Doc. 326 ("Mar. 26 Tr."), 90:4–6.) Following his retention, Attorney Atlas initiated settlement discussions with counsel for the Trust and Mr. Papoutsis. (Mar. 26 Tr., 100:19–23; 101:23–25; 102:1–25; 103:1–104:19.) During this time, Attorney Atlas also prepared and filed a Verified Amended Complaint, which asserted expanded claims and named additional parties, including Wilmington Trust and Mr. Papoutsis in their fiduciary capacities (the "Amended Complaint"). (*See* Am. Compl.) The Amended Complaint was filed in the Delaware Chancery Court on April 25, 2024. (*See id.*)

In early May 2024, during settlement discussions, Attorney Atlas received the APX Company Valuations prepared in March 2024 by Tucker & Meltzer.[4] (Mar. 26 Tr., 100:21–101:3.) Guided by these reports, the parties exchanged settlement proposals, with the Debtor initially demanding $5 million and the Trust offering $3.1 million. (*See* Mar. 26 Tr., 101:12–14.) These discussions stalled in late June 2024 after the Trust raised concerns over certain filings made by the Debtor's husband in his Chapter 13 bankruptcy proceeding. (Mar. 26

---

[4] After receiving the APX Company Valuation Reports, the Debtor asked Attorney Atlas to obtain competing valuations of the APX Companies. Attorney Atlas explored the option but concluded that the cost and risk were unjustified given the general soundness of the methodology used in the existing reports. (Mar. 26 Tr., 107:4–108:25.)

Tr., 102:12–24.) Discussions resumed in early August 2024 as briefing deadlines approached in the Delaware Chancery Court Litigation. (Mar. 26 Tr., 103:22–104:1.)

On or about September 6, 2024, the Debtor and other parties executed the Term Sheet setting forth the material terms of an agreement resolving the Delaware Chancery Court Litigation for $3.15 million. (*See* Term Sheet, Doc. 189-8.) The Term Sheet indicates that the parties' agreement is subject to the execution of a final settlement agreement. (*Id.*) The $3.15 million settlement amount reflects a compromise between the Debtor's final demand of $3.825 million and the Trust's prior offer. (Trustee's Rpt., pp. 3–4.) The agreement was intended to resolve the matter and avoid further litigation.

On October 25, 2024, before the final settlement agreement was executed, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, commencing Case No. 1:24-bk-2752 in this Court. Steven M. Carr was appointed as Chapter 7 Trustee. The filing triggered the automatic stay under 11 U.S.C. § 362, thereby halting the Delaware Chancery Court Litigation. The case was dismissed on December 17, 2024 due to the Debtor's failure to comply with the credit counseling requirements of 11 U.S.C. § 521(i).[5] The next day, on December 18, 2024, the Debtor commenced the present case, and Steven M. Carr was again appointed as Chapter 7 Trustee.

After his appointment, the Trustee retained Attorney Atlas as Special Counsel to assist with his evaluation of the Delaware Chancery Court Litigation.[6] The Trustee then reviewed the

---

[5] On December 2, 2024, before the Debtor's prior case was dismissed, the Trustee filed a motion to approve a compromise substantially similar to the one now before the Court. The Court did not rule on that earlier motion because the Court dismissed the case on December 17, 2024. However, the prior proceedings laid much of the groundwork for the current motion, enabling the Trustee to file it promptly upon the commencement of this case.

[6] On December 19, 2024, the Trustee filed an application to employ Attorney Atlas as Special Counsel. (Doc. 28.) The Court approved the application over the Debtor's objection on January 28, 2025. (Doc. 133.) In the Debtor's initial Chapter 7 case, the Trustee had retained Attorney Atlas in the same role without objection.

pleadings in the Delaware Chancery Court, conferred with Attorney Atlas, and evaluated the Debtor's interest in the Trust.[7] (Trustee's Rpt., pp. 4, 8.) In the course of this review, the Trustee concluded that the Debtor's beneficial interest in the Trust was discretionary and protected by a spendthrift clause under Delaware law. (Trustee's Rpt., p. 4; Trust § 5, p. 5.) Based on this assessment, he determined that continuing the Delaware Chancery Court Litigation was unlikely to produce a meaningful recovery for the estate in light of the anticipated costs and risks. (Trustee's Rpt., pp. 4–6.) The Trustee thereafter engaged in settlement discussions with representatives of the Trust and, on behalf of the estate, agreed to proposed terms for a global resolution under which the estate would receive $3.15 million in exchange for a release of all claims asserted or assertable in the Delaware Chancery Court Litigation, subject to execution of a final settlement agreement.[8] (Trustee's Rpt., pp. 10–11.)

On December 19, 2025, the Trustee filed the instant Motion to Compromise Claim pursuant to Rule 9019. (*See* Doc. 29.) The Debtor filed a formal objection, asserting that the settlement undervalued the Delaware Chancery Court Litigation claims and lacked sufficient evidentiary support.[9] (*See* Doc. 67; *see also* Debtor's Supplemental Memorandum in Opposition to Trustee's Motion to Compromise, Doc. 159 ("Debtor's Mem.").) In light of the significant interests involved, the Court directed the Trustee to submit a written report detailing, among

---

[7] The Trustee also evaluated the Debtor's 32% limited partnership interest in the FLP. (Trustee's Rpt., pp. 9–10.) The Trustee does not presently seek to liquidate this interest.

[8] Attorney Atlas negotiated this figure pre-petition to include a $350,000 premium above the rounded-up $2.8 million appraised value set forth in the APX Company Valuation Reports for the Debtor's interest in the Class B shares. The premium accounted for litigation risk, structural uncertainty, disclosed and undisclosed assets, and downside protection for the estate. (Mar. 26 Tr. 82:14–24 (The Court notes that the Trustee's testimony indicated that Attorney Atlas negotiated a $300,000 premium to account for these risks. However, the APX Company Valuation Reports and the Term Sheet reflect a $350,000 difference. Thus, the Court utilizes the $350,000 figure for mathematical consistency.).)

[9] No other party in interest, including creditors, objected to the Trustee's motion. However, on March 20, 2025, the Trust filed a joinder supporting the Trustee's Motion to Compromise Claim. (*See* Doc. 256.)

other considerations, his rationale for pursuing the proposed settlement. (*See* Doc. 174.) The Trustee submitted this report on February 11, 2025. (Doc. 189.) Thereafter, the parties engaged in limited discovery related to the Trustee's Report to prepare for an evidentiary hearing. (*See* Doc. 174.)

The Court held evidentiary hearings over two days, on March 26 and April 3, 2025. During these hearings, the Trustee offered into evidence his written report, outlining the rationale for proposing the compromise as evidence. (*See* Mar. 26 Tr., 21:17–24:11, 25:12–30:21; *see also* Trustee's Rpt.) He also testified in support of the proposed compromise, including an assessment of the complexity of the Delaware Chancery Court Litigation, the probability of its success, and the benefit of the proposed compromise to creditors of the estate. (*See* Mar. 26 Tr., 31:6–87:19.) The Trustee's Report and testimony emphasized the complexity of litigating claims involving discretionary trust interests, the speculative nature of recovery given the Trust's non-controlling Class B shares, and the strength of Delaware law protections applicable to spendthrift trusts. (*See* Trustee's Rpt.; *see also* Mar. 26 Tr., 31:6–87:19.) Attorney Atlas provided similar testimony at the March 26, 2025 hearing supporting the proposed compromise. (*See* Mar. 26 Tr., 89:4–113:21.)

At the conclusion of the evidentiary hearing held on April 3, 2025, the Court closed the evidentiary record, and the matter was taken under advisement. The parties have submitted post-hearing briefs,[10] and the matter is now ripe for decision.

### III. ANALYSIS

The question presented is whether the Chapter 7 Trustee's proposed settlement satisfies the standards for approval under Rule 9019 and *In re Martin* by demonstrating that the compromise is

---

[10] (*See* Trustee's Brief in Support of Motion to Compromise Claim, Doc. 336 ("Trustee's Br."); Debtor's Post-Hearing Brief in Opposition to Trustee's Motion, Doc. 339-1 ("Debtor's Br."); Doc. 337.)

fair and equitable, reflects a sound exercise of business judgment, and appropriately considers the

Debtor's interest as a potential surplus party under 11 U.S.C. §§ 704(a)(1) and 726(a)(6).[11]

### A. LEGAL FRAMEWORK FOR EVALUATING TRUSTEE SETTLEMENTS

The Supreme Court has explained that, in reviewing a proposed compromise, "it is

essential that every important determination . . . receive the 'informed, independent judgment' of

the bankruptcy court." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424 (1968) (citation omitted). The court must apprise itself "of all facts

necessary for an intelligent and objective opinion" and consider all "factors relevant to a full and

fair assessment of the wisdom of the proposed compromise." *Id.* Courts often summarize this

inquiry as requiring that the proposed settlement be "fair and equitable." *Will v. Northwestern*

*Univ.* (*In re Nutraquest, Inc.*), 434 F.3d 639, 644 (3d Cir. 2006).

In the Third Circuit, the governing standard for this inquiry is set forth in *Myers v. Martin*

(*In re Martin*), 91 F.3d 389 (3d Cir. 1996), which identifies four factors that inform the court's

evaluation: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3)

the complexity of the litigation[,]" including the "expense, inconvenience[,] and delay" of

proceeding; and "(4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393. In

articulating this framework, the Third Circuit emphasized the institutional policy favoring

compromise, noting that "compromises are favored in bankruptcy" because they reduce litigation

and expedite estate administration. *Id.* (internal quotation marks and citation omitted).

Although some courts have separately considered whether a trustee's decision reflects a

legitimate exercise of business judgment, the Third Circuit evaluates that inquiry within the

---

[11] In the Trustee's Motion to Approve Compromise and March 20, 2025 Pre-Hearing Status Conference, he also argued in the alternative that the Term Sheet is an executory contract that he should be permitted to assume. (Doc. 29, p. 3.) Because of the Court's ruling on the *Martin* factors below, the Court need not address this argument.

8

*Martin* framework, allowing trustee discretion, consultation with professionals, and sound judgment to inform the court's evaluation of the four factors. *See In re Martin*, 91 F.3d at 395; *Stanziale v. U.S. Risk Ins. Grp., Inc.* (*In re NovaPro Holdings, LLC*), 815 F. App'x 655, 658 (3d Cir. 2020) (citing *Martin* and collecting cases emphasizing deference to the trustee's judgment where the compromise is fair and equitable); *In re Summit Metals Inc.*, 477 F. App'x 18, 21 (3d Cir. 2012) (affirming approval of settlement because the trustee's "business decision" was supported by *Martin*'s factor analysis); *In re ID Liquidation One, LLC*, 555 F. App'x 202, 206–07 (3d Cir. 2014) (holding the bankruptcy court did not abuse its discretion where *Martin* factors and trustee's evaluation justified settlement approval). The trustee, as the proponent of the compromise, bears the burden of demonstrating that the settlement meets the applicable standard. *See In re Martin*, 91 F.3d at 393; *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005).

The Third Circuit also emphasizes that the relevant inquiry is not whether the settlement represents the best possible outcome for the estate, but "whether the terms of the proposed compromise fall 'within the reasonable range of litigation possibilities.'" *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) (citation omitted). Courts have consistently held that it is only necessary to determine whether the settlement falls "somewhere above the lowest point in the range of reasonableness." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (internal quotation marks omitted); *see also Key3Media Grp., Inc. v. Pulver.com, Inc.* (*In re Key3Media Grp., Inc.*), 336 B.R. 87, 93 (Bankr. D. Del. 2005). Accordingly, it is "[o]nly if the Court concludes that the settlement falls below the lowest point in the range of reasonableness should the compromise be rejected." *In re Edwards*, 228 B.R. 552, 569 (Bankr. E.D. Pa. 1998).

## B. APPLICATION OF THE MARTIN FACTORS

As a threshold matter, the Court finds that the claims asserted in the Delaware Chancery Court Litigation are property of the bankruptcy estate under 11 U.S.C. § 541. These claims involve alleged misconduct in the administration of a trust in which the Debtor holds a beneficial interest. Because the claims existed as of the petition date, they became property of the estate upon filing, and only the Trustee has the authority to pursue or settle them. *See* 11 U.S.C. §§ 541, 704(a)(1); *3 Collier on Bankruptcy* ¶ 323.02[1] (16th ed. 2025) ("[O]nly the trustee has standing to pursue a prepetition cause of action unless the cause of action is abandoned by the trustee pursuant to section 554(a).").[12]

The Court now turns to the *Martin* factors and evaluates the Trustee's business judgment within the governing framework. In doing so, the Court notes that the Trustee's determinations on each of the *Martin* factors—whether relating to probability of success; difficulties in collection; complexity, expense, inconvenience, and delay; and creditors' interests—reflect his evaluation of the settlement based on: (1) consultation with Attorney Atlas as Special Counsel;[13] (2) his review of the Trust document and the pleadings filed in the Chancery Court;[14] (3) his review of the APX Company Valuations appraising the Class B non-voting stock held by the

---

[12] *See, e.g., Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) (holding that once an asset, including a legal claim, becomes part of the bankruptcy estate, all rights in that asset transfer to the trustee unless formally abandoned under Section 554); *Moneymaker v. CoBen* (*In re Eisen*), 31 F.3d 1447, 1451 n.2 (9th Cir. 1994) (explaining that once a trustee is appointed, the debtor's causes of action become estate property, and only the trustee has standing to assert or appeal them under Section 323); *Griffin v. Beaty* (*In re Griffin*), 330 B.R. 737, 740 n.2 (W.D. Ark. 2005) (rejecting the argument that surplus debtor status confers standing to pursue estate-owned claims); *In re Smith*, 185 B.R. 285, 291–92 (Bankr. S.D. Ill. 1995) (collecting cases and holding that a Chapter 7 trustee had standing to assert a debtor's partnership rights that became property of the estate under Section 541).

[13] (Trustee's Rpt., p. 8 ("Trustee has had several conversations with Special Counsel as Trustee was investigating the valuation of the Delaware litigation and the liquidation thereof. . . . Trustee gave and gives great weight to the advice of counsel."); Mar. 26 Tr. 70:5–8 ("I relied on Mr. Atlas for information regarding the litigation[ and] the settlement[.] That went into my evaluation of the *Martin* factors.").)

[14] (Trustee's Rpt., p. 4 (Trustee "is relying on Special Counsel and Trustee's review of the Trust document and pleadings[.]").)

10

Trust;[15] (4) his own experience as an attorney and Chapter 7 trustee;[16] and (5) information developed from settlement negotiations.[17] The Court finds the Trustee's reliance on these varied sources to be reasonable and appropriate to his evaluation under *Martin* and the governing principles set forth above. For the reasons set forth below, this reliance was also sufficient to discharge his duties under *Martin*.

### 1. Probability of Success in the Litigation

The first *Martin* factor requires the Court to assess the likelihood that the estate would succeed in the Delaware Chancery Court Litigation if the claims were prosecuted to judgment. *In re Martin*, 91 F.3d at 393. A bankruptcy court does not need to conduct a "mini-trial on the merits[;]" instead, the Trustee need only present a reasonable, fact-based assessment of litigation risk, supported by the record. *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 1999); *see also In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010).

Based upon his review of the above sources, the Trustee concluded that the estate's likelihood of success was far from certain. He first emphasized that the Trust is discretionary in nature, granting its trustee sole authority over distributions—a structure that poses a significant

---

[15] (Trustee's Rpt., p. 4 ("Trustee's review of the valuations and methodology used further convinced the Trustee that the valuations were sound.").)

[16] (*Id.* at 5 ("It is Trustee's conclusion based upon his review of the pleadings and consultation with counsel that the litigation is far from a 'slam dunk.'"), 6 ("Trustee has experienced this reality in multiple situations, both as a Trustee and as a transactional attorney involved in the sale of business interests. The reality is that one seeking to liquidate a minority interest with no authority or voting rights in a privately held company has very few choices, thereby clearly lowering the value.").)

[17] (*Id.* at 3 ("Using the rounded-up $2.8 million valuation as a 'floor' for the value of Debtor's interest, the parties discussed a settlement term sheet that contemplated a secondary or even tertiary appraisal process. . . . Ultimately, the parties opted to forego further appraisals. . . . Debtor initially demanded $4.2 million[,] reduced her demand to $3.825 million[,] . . . [and s]ettlement discussions ceased until early August 2024. . . . The parties then agreed to the $3.15 million settlement."); *id.* at 4 ("Trustee, as set forth below, is relying . . . on the settlement negotiations to satisfy his conclusion that the valuation date was appropriate and that the valuation is proper.")); *see also* Mar. 26 Tr. 84:8–85:12 (Trustee testifies that it is significant to him that the Debtor's sister, who was also a beneficiary to the Trust with similar rights to those of the Debtor, "was willing to accept an identical amount of money which . . . basically acknowledges that $3.15 million is an appropriate value for the settlement.").)

legal hurdle to any compelled recovery.[18] He further explained that the estate's claims sound in breach of fiduciary duty and fraud, both of which require heightened proof beyond a preponderance of the evidence under Delaware law.[19] The Trustee also evaluated the evidentiary challenges posed by the personal relationship between the Debtor and Mr. Papoutsis and determined that this dynamic would likely impair the Debtor's credibility at trial and increase the complexity of the case.[20] Finally, he noted that Attorney Atlas had moved to withdraw as the Debtor's counsel in the Delaware Chancery Court Litigation, a development he believed would further impair the estate's ability to prosecute the case.[21] In light of these considerations, the Trustee concluded that the estate's chances of success were "far from certain" and "nowhere near

---

[18] (*See* Trustee's Br., p. 6 ("The Trust is clearly a discretionary Trust wherein the Trustee in its sole discretion can opt to make or not make a distribution. The effort to force a Trustee to make distribution under any legal theory faces an uphill struggle."); Trustee's Rpt., p. 5 ("It is difficult to predict that Debtor would prevail via further litigation given the discretionary aspect of the Trust. It is Trustee's conclusion based upon his review of the pleadings and consultation with counsel that the litigation is far from a 'slam dunk.'"); p. 4 ("At the same time, it is clear that the Trust was created by Debtor's father to provide for his children and to protect them (while at the same time obtaining tax advantages) and that total discretion for distributions was vested in the Trust. No distributions are required for any beneficiary."); *see also* Trust § 5, p. 5 (Spendthrift Provision).)

[19] (Trustee's Br., p. 6 ("The claim involves allegations of fraud. The undisputed testimony by the Trustee and state court counsel establish that a heightened standard of proof, beyond a mere preponderance of the evidence, will be required in order to prevail[.]"); Mar. 26 Tr. 46:20–25 ("Fraud is a very, very difficult thing to prove. It has a higher standard of proof. So rather than a preponderance of the evidence, fraud requires clear and convincing evidence. I believed then, and I still believe, that trying to succeed on a fraud claim in this litigation is almost a Hail Mary, meaning very difficult."); *see also id.* at 112:21–25 ("It's a heightened pleading standard. You have to plead it with particularity. Whether or not we did that in the amended complaint is up for interpretation. It is a very -- it is a very high bar. It is a very high bar. I -- I'm not sure what else I'm at liberty to say.").)

[20] (Trustee's Br., p. 7 ("There is a real danger that Debtor's credibility will be damaged in litigation based upon her animus towards her father[.]"); *id.* ("It is significant that the settlor of the trust is Debtor's father and that the source of the assets that form the corpus of the trust is Debtor's father. Debtor, as evidenced by her testimony, is clearly angry with her father and blames him for her financial woes. She even testified that she wanted her husband to "go after my dad."); Trustee's Rpt., p. 4 ("When adding to the equation the emotional component that the suit involves an estranged daughter suing her father, the complexity increases.").)

[21] (Trustee's Br., p. 7 ("Attorney Atlas also testified that he and his firm will be withdrawing from representation if the litigation is to continue. . . . Unquestionably, that withdrawal negatively impacts the probability of success of the litigation.").) Indeed, it appears that Attorney Atlas withdrew from the Delaware Chancery Court Litigation on April 10, 2025. (Debtor's Br., p. 2.)

12

100%."[22] The Court finds that the Trustee's evaluation of this factor was both diligent and reasonable, and appropriately grounded in the legal and factual challenges outlined above.

The Debtor challenges the Trustee's evaluation under the first *Martin* factor on multiple grounds.[23] (*See* Debtor's Post-Hearing Brief in Opposition to Trustee's Motion to Compromise Claim, Doc. 339-1 ("Debtor's Br."); Debtor's Mem.) As an initial matter, she raises a group of related objections focused on: (1) the Trustee's alleged over-reliance on Attorney Atlas and failure to conduct an independent assessment of the estate's claims; (2) the Trustee's deference to Attorney Atlas, whose primary objective was settlement rather than litigation;[24] (3) Attorney Atlas's alleged bias stemming from his contingency fee arrangement; and (4) the Trustee's reliance on Attorney Atlas's conclusions without independently verifying key facts or reviewing critical trust documents, including the First and Second Amendments to the Trust and Schedule A. (*See* Debtor's Br., pp. 1–3.) Relatedly, the Debtor asserts that the Trustee and Attorney Atlas improperly valued the Class B stock in isolation, ignoring broader allegations of constructive fraud, fiduciary breach, and collusion. (*See id.* at 3.) In the Debtor's view, these shortcomings amount to an abdication of the Trustee's duty to perform an objective, outcome-based assessment of the estate's litigation prospects. (*Id.* at 2.)

---

[22] (Trustee's Br., p. 6 ("[I]t is evident that in this case the probability of success is nowhere near 100%. Rather, the probability of success is far from certain. Indeed, the estate is unlikely to achieve a better result in litigation than the $3.15 million on the table because the claim faces numerous substantial obstacles[.]").)

[23] The Debtor is *pro se* and has been transparent about using artificial intelligence ("AI") tools to prepare her filings. Her use of AI appears to have led to some arguments being misplaced relative to the elements at issue. Accordingly, the Court will address those arguments in the sections where they are most appropriately considered, rather than where the Debtor originally included them.

[24] The Debtor also argues that the Amended Complaint filed by Attorney Atlas in the Delaware Chancery Court Litigation weakened the estate's claims by downplaying Wilmington Trust's role in the alleged fraud. (Debtor's Br., pp. 3–4.)

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 13 of 44

The record does not support these objections. Initially, the Court notes that it was not improper for the Trustee to consult with and rely on the advice of Attorney Atlas regarding the merits of the Delaware Chancery Court Litigation. To the contrary, courts have consistently held that a trustee may properly rely on the informed advice of retained professionals, particularly counsel and financial advisors, when exercising business judgment under Rule 9019. *See In re NovaPro Holdings, LLC*, 815 F. App'x at 658 (holding that it was reasonable for the court to give some deference to the trustee's judgment where it was supported by his testimony and the robust analysis of a financial advisor); *In re Key3Media Grp., Inc.*, 336 B.R. at 97 ("In addition to the creditors' objections, the court may give weight to the opinions of the trustees, the parties, and their counsel, in determining the reasonableness of the proposed settlement."). In this case, Attorney Atlas testified that he practiced exclusively in Delaware corporate law, including trust litigation, and had previously worked at Skadden, Arps, Slate, Meagher & Flom LLP, a firm known for its corporate law practice. (*See* Mar. 26 Tr., 89:12–90:3.) Indeed, Attorney Atlas was approved and retained as Special Counsel for the Trustee specifically to assist with the Delaware Chancery Court Litigation due to his experience handling such matters. In this context, the Court finds that the Trustee's evaluation reflects the kind of professional-informed judgment that courts routinely approve under *Martin*, and that his reliance on Attorney Atlas's advice, to the extent described, was appropriate and supported by the record. The Debtor's objections do not meaningfully undermine this conclusion.

Moreover, the Court reiterates that the Trustee's evaluation does not reflect an "over-reliance" on Attorney Atlas or a failure to conduct an independent assessment of the estate's claims. It also included his review of: (1) the Trust documents; (2) the pleadings in the Delaware Chancery Court Litigation; (3) the APX Company Valuations and their methodology; (4) his own

14

professional experience as a Chapter 7 trustee and transactional attorney; and (5) information developed during both pre- and post-petition settlement negotiations. *See supra* Section III.B. This multi-faceted analysis reflects exactly the type of independent diligence Rule 9019 contemplates. Hence, the record does not support the claim that the Trustee over-relied on Attorney Atlas or failed to conduct an independent assessment of the estate's claims.

The Court also rejects the claim that the Trustee improperly deferred to a settlement-focused counsel.[25] Attorney Atlas credibly testified that the Amended Complaint was filed during his representation of the Debtor alone, and that its purpose was to apply pressure to settle rather than to obtain a judgment. (Mar. 26 Tr., 100:3–16 ("The strategy was to settle, right? The strategy was to exert pressure by filing the lawsuit against Father and bring legitimate claims[.] . . . I believe filing a much more comprehensive lawsuit that was more rooted from a legal experience would derive the settlement, which is ultimately what happened.").) As her attorney at the time, Attorney Atlas was competent to testify to that strategy, and the Court finds his explanation credible. Thus, the Trustee's goal "to settle and to force a decanting of the trust and a payout to Debtor of her trust interest" merely reflects a continuation of the preexisting objective set by the Debtor herself. (*See* Trustee's Brief in Support of Motion to Compromise Claim, Doc. 336 ("Trustee's Br."), p. 7.) The Court will not entertain an objection that characterizes as improper the very strategy the Debtor personally adopted and pursued before the Trustee's

---

[25] To the extent the Debtor contends that Attorney Atlas "stands to receive nothing if the estate proceeds with litigation," Debtor's Br., p. 2, she has provided no evidentiary support for that assertion. The record does not reflect any contingency arrangement limiting compensation to settlement alone, nor has the Debtor pointed to such a restriction.

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 15 of 44

appointment.[26] Accordingly, the Trustee's reliance on Attorney Atlas does not constitute improper delegation or "circular reasoning" as the Debtor asserts.

To the extent the Debtor argues that Attorney Atlas was biased by his contingency fee or prior role as her counsel, the Court has already considered and rejected this objection. The Debtor raised the same concerns in her Objection to the Trustee's Application to Retain Special Counsel under 11 U.S.C. § 327(e). (*See* Doc. 124.) The Court overruled those objections and approved the Application by Order dated January 28, 2025. (*See* Doc. 133.) The Debtor has not presented new evidence or changed circumstances that would justify revisiting that ruling. Bankruptcy courts retain jurisdiction to interpret and enforce their orders. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 138 (2009) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934)). The Debtor's renewed objections to Attorney Atlas's retention and compensation are procedurally foreclosed and do not affect the Trustee's analysis under the first *Martin* factor.

The Court also rejects the Debtor's argument that the Trustee failed to account for potentially valuable, undisclosed Trust assets, such as life insurance policies, cash, or ownership interests in entities that were not clearly valued, based on the absence of Schedule A and the First Amendment to the Trust. The Court acknowledges, as both the Trustee and Attorney Atlas did, that additional Trust assets might exist and could, in theory, increase the Debtor's interest. (*See* Mar. 26 Tr., 128:5–6 (Attorney Atlas agreeing with the Trustee's assessment that "anything is possible" with respect to the Trustee's view that the existence of additional assets was theoretically possible but not consequential to the estate's claims).) But both concluded, based on

---

[26] For the same reason, the Court is unpersuaded by the Debtor's argument that the Amended Complaint filed by Attorney Atlas in the Delaware Chancery Court Litigation weakened the estate's claims by downplaying Wilmington Trust's role in the alleged fraud. The Amended Complaint was filed pre-petition by Attorney Atlas while representing the Debtor alone, and the Debtor reviewed, approved, and verified the pleading before it was filed. The Trustee cannot now be faulted for adopting a litigation strategy that originated with the Debtor herself. Her present criticism of that strategy does not undermine the reasonableness of the Trustee's judgment under *Martin*.

the Trust's legal structure and the record evidence, that the risk of undisclosed material assets was low and adequately addressed in the proposed settlement. The Court agrees for the following reasons.

First, Attorney Atlas testified that a 2012 Schedule A would not reliably reflect current holdings due to the natural evolution of interests, cash, and insurance over time. (*See* Mar. 26 Tr., 126:21–128:23.) He further explained that the Trust's structure gave the Debtor and her sisters no control or ability to compel distributions, meaning that any amendments or updates would not have affected the enforceability or value of their interests. (*Id.*) The Trustee similarly testified that he did not find the absence of these documents "overly significant" in light of the posture of the litigation. (Mar. 26 Tr., 59:2–6.) Both concluded that it was the legal and practical barriers, not informational gaps, that were the principal drivers of litigation risk.

Second, even if the missing documents had raised material concerns, the Trustee intends to rely on representations and warranties in the final settlement agreement to mitigate that risk. Attorney Atlas testified that the parties secured contractual assurances confirming the composition of the Trust, such that any material misstatement would give rise to a breach of contract claim against the party responsible for the misstatement. (Mar. 26 Tr., 127:17–22.) That approach is consistent with the Trustee's duty under 11 U.S.C. § 704(a)(1) to maximize estate value while managing litigation risk. Based on the record—and conditioned upon submission of the executed final settlement agreement that includes the representations and warranties described in the record—the Court finds that the absence of Schedule A and the First Amendment does not undermine the reliability of the Trustee's settlement analysis or materially affect his judgment.

17

Lastly, the Debtor asserts that the Trustee and Attorney Atlas improperly and narrowly focused their valuation on the Class B stock, disregarding broader allegations of constructive fraud, breach of fiduciary duty, and collusion—misconduct that, she contends, artificially depressed the stock's value. (*See* Debtor's Br., p. 3.) However, as explained above, the Trustee's assessment was not limited to the valuation of the stock in isolation, as the Debtor suggests. It reflected a risk-adjusted evaluation of the estate's overall position, including the burdens of proof, the Trust's structure, and credibility challenges. *See supra* Section III.B.1. Moreover, the Debtor's objection assumes the truth of several allegations not supported by the record. She presumes that the Trustee failed to consider fraud or collusion and further asserts that additional investigation would uncover a higher value for her beneficial interest in the Trust. These assumptions lack evidentiary support. The Trustee acknowledged the Debtor's allegations of fraud related to both the FLP and the Trust but testified that he found no credible evidence to support them. (Mar. 26 Tr., 64:16–17 ("You made allegations of fraud, but I didn't see that there was any true evidence of fraud.").) Absent such evidence, the Debtor's contention that further investigation would enhance the value of her beneficial interest has no merit. These considerations formed part of the Trustee's overall evaluation of litigation risk. After reviewing the evidence, testimony, and pleadings, the Court agrees with the Trustee's assessment. There is no credible support for claims of fraud or collusion, nor any indication that additional investigation would have yielded materially greater value in the record. These claims do not warrant further analysis and do not undermine the Trustee's decision to settle.

In light of the complexity of the legal claims, the protections afforded by Delaware trust law, the Debtor's evidentiary vulnerabilities, and the risk of litigation without counsel, the Court finds that the Trustee conducted a diligent and reasonable evaluation of the estate's likelihood of

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 18 of 44

success. That assessment drew on professional consultation, document review, valuation analysis, and litigation experience. Courts have consistently held that a trustee's business judgment, when informed by experienced professionals and a realistic appraisal of litigation exposure, is entitled to deference. *See In re Key3Media Grp., Inc.*, 336 B.R. at 97. The Trustee has therefore satisfied the first *Martin* factor.

### 2. Likely Difficulties in Collection

The second *Martin* factor examines the likely difficulties in collecting a judgment if the estate prevails on the merits. *See In re Martin*, 91 F.3d at 393. Courts recognize that even a successful judgment may offer little value to creditors if collection is unlikely, costly, or significantly delayed. *See Summit Metals, Inc. v. Chapter 11 Liquidating Tr. (In re Summit Metals, Inc.)*, No. 09-256, 2011 WL 1085680, at *2 (D. Del. Mar. 23, 2011) (affirming approval of settlement based on the trustee's business judgment and the bankruptcy court's finding that "there is just so much uncertainty in the pursuit of the collection of this judgment"); *In re Key3Media Grp., Inc.*, 336 B.R. at 96–97 (approving settlement where the likelihood of collection was uncertain due to counterclaims, appeal risks, and doubts about the defendant's financial capacity).

Relying again on the materials and consultations previously described, the Trustee concluded that even if the estate prevailed in the Delaware Chancery Court Litigation, its ability to recover value was substantially impaired. In support of this conclusion, the Trustee observed that a successful judgment would likely result in the estate acquiring non-controlling, non-voting Class B shares in closely held private entities—an interest that is illiquid, difficult to value, and

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 19 of 44

challenging to market.[27] (Trustee's Rpt., p. 6; Trustee's Br., p. 8; *see also* Mar. 26 Tr., 109:9–111:12.) He reasonably determined that any meaningful realization from these shares would require extended negotiations, forced liquidation efforts, or additional litigation, each involving significant cost, delay, and risk to the estate. (Trustee's Rpt., p. 6; Trustee's Br., p. 8.) Courts have recognized that such illiquidity and lack of control substantially reduce the practical value of any recovery. *See In re Key3Media Grp., Inc.*, 336 B.R. at 96–97 (acknowledging that concerns about collectability from a privately held entity may be relevant to settlement approval, though unsupported in that case). The Court is satisfied that the Trustee's evaluation of this factor was diligent and supported by the legal and factual challenges discussed above.

As with the first *Martin* factor, the Debtor challenges the Trustee's conclusions regarding the collectability of a judgment on multiple grounds. She argues that the parties responsible for a judgment—her father and Wilmington Trust—control substantial assets and that the Trustee failed to investigate their solvency, insurance coverage, or ability to pay. (Debtor's Br., pp. 5–6; Ex. D-6.) The Debtor cites Exhibit D-6, which was admitted into evidence with the exception of the first page, to demonstrate that Mr. Papoutsis owns substantial real estate holdings. She argues this undermines the Trustee's assertion that collection would be difficult. She further contends that the Trustee has made no effort to investigate collectability, has failed to pursue monetization of the Class B shares, and has not conducted even minimal discovery or a forensic review that might have improved the estate's bargaining position.[28] (*See* Debtor's Mem., pp. 5–6; Debtor's

---

[27] The Trustee's assessment was supported by his unsuccessful efforts to engage brokers to market the Debtor's FLP interest. He testified that he contacted two reputable local brokers, both of whom declined to pursue a sale, expressing no interest in marketing the asset. (Mar. 26 Tr., 61:3–8; *see also* Trustee's Rpt., pp. 9–10.) Their unwillingness to take on a similarly illiquid asset reinforced the Trustee's conclusion that no viable market existed for the Class B shares.

[28] To the extent the Debtor argues that the Trustee should have pursued distributions from the Trust, the Court finds that this argument is likely foreclosed by the discretionary and spendthrift provisions in the Trust, which allow only for discretionary distributions to the Debtor. (Trust, pp. 1–2 ("Trustee may, from time to time, distribute to

Br., p. 5.) She also relies on business records in Exhibit T-9, which she claims show that APX Companies within the Trust generated more than $3 million in profit during 2023—a figure she argues the Trustee failed to consider in evaluating collection potential. (Debtor's Br., p. 5.) Finally, she asserts that the Trustee overlooked the Debtor's interest in the FLP as an alternative recovery source. (*Id.* at 13–15.) According to the Debtor, the Trustee relied on her sister's K-1 capital account rather than seeking a proper valuation of the FLP's real estate portfolio, which she contends may be worth over $8 million. (*See id.* at 13–14.)

To the extent the Debtor criticizes the Trustee for failing to investigate the solvency of Wilmington Trust or Mr. Papoutsis, or for not exploring potential insurance coverage to improve the estate's bargaining position, her argument misunderstands the nature and posture of the Delaware Chancery Court Litigation. As detailed in the Court's analysis of the first *Martin* factor, the Trustee, based on consultation with counsel, review of the pleadings, and litigation strategy, reasonably concluded that the estate's claims were unlikely to yield a monetary judgment against the named defendants. That conclusion was informed by multiple legal and evidentiary obstacles, including the Trust's discretionary structure, the elevated burden of proof applicable to the Debtor's claims, and the significant challenges associated with developing a credible evidentiary record. Attorney Atlas, who represented the Debtor in the Delaware Chancery Court Litigation, testified that the case was not a "damages" action but rather a strategic effort to pressure the Trust into decanting and distribution. (Mar. 26 Tr., 111:22–23.) He repeatedly emphasized that success would not result in a financial award against Wilmington

---

[beneficiaries] all, some, or none of the net income or principal in such amounts and proportions . . . as Trustee, in its sole discretion, deems appropriate[.]"), 5 ("[N]o one . . . may attach or otherwise reach any interest of any beneficiary hereunder to satisfy a claim against that beneficiary, whether the claim is legal or equitable in origin.").) Moreover, to challenge the Trust structure would require the Trustee to litigate the Delaware Chancery Court Litigation to its end, which is precisely what he seeks to avoid by pursuing the instant settlement.

Trust or Mr. Papoutsis, but merely a judgment with no practical recovery—"a piece of paper," not money. (*See id.* at 111:1–6, 111:22–25, 112:1–14.) That framing necessarily informed the Trustee's decision to forego speculative collection efforts, including investigations into the defendants' assets or insurance coverage. The focus of the litigation—and thus of the settlement—was always the Trust itself. Because the settlement achieved that objective, the Trustee's decision to forego further investigation into the named defendants' solvency reflects a rational, strategy-aligned judgment, not a failure of diligence.

The same applies to the Debtor's reliance on Exhibit T-9, which shows that the APX Companies, whose Class B stock is held by the Trust, generated over $3 million in profits in 2023. Even assuming those profits are accurate, they are legally and practically irrelevant to the Trustee's collectability analysis. As previously discussed, any recovery through litigation would likely result in the estate acquiring illiquid, non-controlling Class B stock. The profitability of the APX Companies does not alter the fact that their Class B shares are non-voting, lack marketability, and confer no enforceable right to compel distributions. The Trustee reasonably concluded that access to those profits, even if theoretically available, would not meaningfully improve the estate's ability to collect. In that context, the proposed settlement offered the only reliable and immediate value to the estate, and the Trustee's strategic focus on securing that value was well within the bounds of sound business judgment.

The Trustee also investigated the Debtor's FLP interest as an alternative source of recovery. According to the Trustee, this interest suffered from transfer restrictions, had never generated distributions, and offered little prospect of yielding sufficient value to satisfy creditor claims. (Trustee's Rpt., pp. 9–10.) To test the market, the Trustee contacted several brokers, but none were willing to list or promote the FLP interest. He then negotiated with Mr. Papoutsis, the

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 22 of 44

FLP's controlling member, and obtained what he perceived to be a highest and best offer of $500,000 for the Debtor's interest. (*Id.*; Mar. 26 Tr., 59:7–61:22, 67:8–11.) The Trustee presented the offer to the Debtor, but she rejected it as too low. As a result, negotiations with Mr. Papoutsis did not progress further. In the Trustee's view, this impasse confirmed the practical illiquidity of the FLP interest and the limited prospects for realizing value through a forced sale or continued marketing. (*See* Trustee's Rpt., p. 9 ("The only other asset that can be liquidated is a family limited partnership interest . . . which suffers from the same [liquidity] problem that the trust assets [have].").) This is the case regardless of how much value the FLP held in its real estate portfolio.

In sum, the Court finds that the Debtor's objections under the second *Martin* factor miss the operative point. Notably, the Trustee has not given significant weight to this factor in recommending the settlement. As he explained in his post-hearing brief, he believes that if the estate were to prevail, the Trust would likely fund a buyout of the Debtor's interest voluntarily. Accordingly, he does not view collection as a substantial independent obstacle. Instead, he identifies the illiquidity and non-controlling nature of the Class B shares as the more significant impediments to realizing value. These limitations, which apply equally to the Trust and the FLP, are thoroughly addressed in the Trustee's analysis under the first and third *Martin* factors.

On balance, the Court agrees with the Trustee that the second *Martin* factor does not weigh against settlement. Because the Trustee's recommendation does not rest on anticipated collection difficulties, and because he reasonably viewed this factor as neutral or modestly favoring compromise, the Court gives it limited weight in the overall analysis. To the extent that it bears on the decision, it provides modest support for approval.

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 23 of 44

### 3. Complexity, Expense, Inconvenience, and Delay

The third *Martin* factor directs the Court to consider the complexity of the litigation and the expense, inconvenience, and delay necessarily attendant to prosecuting the claims. *See In re Martin*, 91 F.3d at 393. Courts consistently recognize that even meritorious claims may be compromised if the cost and delay of litigating them significantly diminishes or negates any potential recovery. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. at 476 (approving settlement where litigation was deemed complex, costly, and unlikely to succeed, and where those burdens rendered compromise well within the range of reasonableness); *In re Grand Prix Assocs. Inc.*, No. 09–16545 (DHS), 2009 WL 1850966, at *3 (Bankr. D.N.J. June 26, 2009) (approving settlement where the cost, delay, and complexity of litigation—including foreign and securities law issues—posed significant detriment to the estate and its creditors). The Court must therefore determine whether the burdens of complexity, expense, and delay reasonably support the Trustee's decision to settle rather than pursue the Delaware Chancery Court Litigation.

Drawing once more on the sources outlined above, the Trustee concluded that continued litigation would be complex, expensive, and prolonged. (Trustee's Rpt., pp. 5–6; Trustee's Br., pp. 9–10.) Attorney Atlas testified that conducting a trial in Delaware could easily exceed $1 million in litigation costs, including expert fees for forensic valuation of the APX Companies. (Mar. 26 Tr., 106:17–107:3.) Based on that, the Trustee concluded that neither the Debtor nor the estate had the resources to fund such litigation, nor was it likely that counsel could be found to advance those costs. (Trustee's Rpt., pp. 5–6; Trustee's Br., pp. 9–10.) The Trustee also considered that Attorney Atlas was seeking to withdraw as the Debtor's counsel, which would require him to retain new representation. He determined that even if new counsel could be found, any contingent fee arrangement would likely rise from 20% to 33–40% due to the case's

24

complexity and history, while hourly representation would be prohibitively expensive. (Trustee's Br., p. 10; *see also* Mar. 26 Tr., 106:17–19.)

The Trustee also evaluated the procedural and practical burdens associated with continued litigation. (Trustee's Rpt., pp. 5–6; Trustee's Br., pp. 9–10.) At the time of his assessment, a motion to dismiss the Amended Complaint was still pending. (Trustee's Br., p. 10; Mar. 26 Tr., 103:2–7, 105:22–25.) No discovery had occurred, and trial preparation would require expert valuation, fact-intensive inquiry, and extended litigation. (Trustee's Br., p. 10.) The Trustee also considered Wilmington Trust's defense posture. It viewed the Debtor's claims as meritless and had little incentive to settle, as it could bill its fees to the Trust, thereby diminishing any recovery to the estate. (Trustee's Br., p. 9; Mar. 26 Tr., 152:5–18.) He further accounted for the Debtor's testimony that her father would "keep throwing lawyers at me until it was over." (Trustee's Br., p. 9; Apr. 3 Tr., 41:22–25.) Attorney Atlas likewise testified that a final trial was unlikely before late 2026. (Trustee's Br., p. 10; Mar. 26 Tr., 105:15–106:1.) On this record, the Trustee's assessment of litigation burden was reasonable, informed by counsel, and reflective of an independent and diligent exercise of business judgment.

The Debtor disputes the Trustee's assessment of litigation burden, arguing that his conclusions rest on unsubstantiated predictions of cost and delay. (Debtor's Br., pp. 4–5.) She contends that the Trustee failed to pursue funding options that could have eased the estate's burden and criticizes his reliance on Attorney Atlas's estimate that trial costs could exceed $1 million. (*Id.*) According to the Debtor, that figure is speculative, outdated, and unsupported by the record. (*Id.* at 5.) She maintains that a forensic valuation could be obtained without such an extraordinary expense and faults the Trustee for not retaining an expert. (*Id.*) The Debtor also challenges the Trustee's emphasis on delay, asserting that "no major creditor is clamoring for an

25

accelerated settlement" and that expediency should not override the Trustee's fiduciary obligations. (*Id.* at 6; Debtor's Mem., p. 8.)

The Court finds that these objections do not undermine the reasonableness of the Trustee's evaluation. The Trustee's conclusions were based on a detailed analysis of procedural posture, expert requirements, evidentiary burdens, and the practical demands of preparing the case for trial. He relied on sworn testimony from Attorney Atlas, an experienced litigator in Delaware trust litigation, who estimated that litigation costs—including forensic valuation—could easily exceed $1 million. The Trustee and the Court have no reason to doubt that Attorney Atlas's cost estimate was correct, given his active Delaware practice, and the Debtor has not meaningfully challenged its accuracy.[29] The Debtor does not dispute that she lacks the financial resources to fund litigation, nor does she present any evidence that qualified counsel would advance those costs on a contingency basis. Likewise, the Debtor does not explain how the

---

[29] The Debtor contends that modern AI tools could reduce or eliminate litigation costs in this case, citing her own performance as a *pro se* litigant as an example. The record does not support that assertion. While it is true that the Debtor has incurred no attorney's fees and has relied extensively on AI tools to prepare her filings, this cost-saving strategy has imposed measurable burdens on the estate and other parties. Her lack of legal representation contributed to prolonged hearings, unnecessary pleadings, and avoidable disputes—developments that likely would not have occurred with the guidance of competent counsel. These inefficiencies have generated additional administrative costs that the estate must bear. Moreover, the Debtor has advanced claims, defenses, and legal theories that lack support in existing law and at times verge on the frivolous. Although AI may assist with basic drafting, it cannot replicate the professional judgment, ethical responsibilities, and procedural discipline of a licensed attorney. This case, if anything, illustrates the risks of overreliance on AI in lieu of legal counsel, particularly in matters involving complex fiduciary duties, evidentiary standards, and the structured demands of federal bankruptcy procedure.

Relatedly, to the extent the Debtor argues that consolidating the Delaware Chancery Court Litigation into an adversary proceeding conducted with the assistance of AI in this Court would conserve estate funds, Debtor's Br., pp. 4–5, the Court disagrees. First, such a transfer lies within the Court's discretion, and this Court, like most bankruptcy courts, is disinclined to remove matters from a state court with deep expertise in Delaware trust and fiduciary law. Second, the Delaware Chancery Court Litigation is already underway, with pleadings pending before a court well suited to resolve them. Relocating the case at this stage would disrupt its natural flow without reducing its complexity. Finally, to the extent the Debtor proffers her own *pro se* representation of the estate in a consolidated proceeding as a cost-saving measure, the Court has already rejected this theory. Indeed, the Court has expressed significant concern about the procedural and practical burdens her *pro se* litigation has already imposed.

Trustee could have obtained forensic valuations for the APX Companies within the estate's financial constraints.[30]

Her suggestion that no creditor is demanding immediate payment does not alter the Trustee's obligation to weigh cost and delay against the benefit to the estate. Moreover, the expected result of continued litigation—namely, recovery of non-voting, non-controlling Class B shares in closely held companies—even if successful, would not provide a reliable or realizable benefit to the estate. Although the Debtor insists that these shares represent substantial value, the Trustee, with the assistance of Attorney Atlas, has credibly determined that these interests lack liquidity, governance rights, and a clear path to monetization.

In light of the demonstrated complexity of the underlying legal issues, the anticipated expense of expert testimony and enforcement efforts, and the likely delays associated with litigating and realizing any recovery, the Court finds that the Trustee undertook a careful and well-supported evaluation of the burdens associated with continued litigation. He reached this conclusion after consulting with Special Counsel, reviewing the pleadings and posture, and independently assessing the legal and factual demands of the case. Against this backdrop, and even assuming complete success in the Delaware litigation, the outcome would likely be the acquisition of illiquid, non-controlling interests in a decanted trust rather than a monetary award for creditors. Accordingly, the Court finds that the Trustee has satisfied the third *Martin* factor

---

[30] To the extent the Debtor relies on her pre-petition agreement with Attorney Atlas to argue that the Trustee could have obtained expert services or valuations at reduced cost, that reliance is misplaced. The Trustee is not a party to the Debtor's pre-petition contract and could not enforce its terms. Even if the contract were executory, it could not be assumed absent compliance with 11 U.S.C. § 365 and approval by the Court. Moreover, because the contract is for personal legal services, it likely could not be assumed without Attorney Atlas's consent. In any event, professionals employed by the estate must be approved under Section 327, and the terms of their retention are governed by Court order, not by the Debtor's pre-petition agreement. Here, the Court approved the Trustee's application to retain Attorney Atlas under terms consistent with that application, which supersede any prior agreement between the Debtor and counsel. (*See* Docs. 28, 133.)

and that his decision to compromise reflects a sound and informed exercise of business judgment.[31]

### 4. Paramount Interest of Creditors

The fourth *Martin* factor requires the Court to consider whether the proposed settlement serves the paramount interests of creditors. *See In re Martin*, 91 F.3d at 393. In applying this standard, courts assess whether the compromise will maximize the estate's value and enable a fair and more immediate distribution to creditors, compared to the risks, delays, and speculative benefits of continued litigation. *See Energy Future Holdings Corp. v. Del. Trust Co.* (*In re Energy Future Holdings Corp.*), 648 F. App'x 277, 282 (3d Cir. 2016) (affirming approval of settlement that avoided prolonged litigation and immediately preserved millions in estate value for distribution to creditors); *In re Grand Prix Assocs. Inc.*, 2009 WL 1850966, at *1–3 (approving settlement to avoid litigation costs and delay and enable a more immediate and beneficial distribution to creditors). The relevant inquiry is not whether the settlement achieves the best conceivable outcome, but whether it falls within the range of reasonableness in light of the estate's circumstances. *See In re Penn Cent. Transp. Co.*, 596 F.2d at 1114; *In re Capmark Fin. Grp., Inc.*, 438 B.R. at 515.

The Trustee concluded that this factor strongly favors settlement. First, he determined that the compromise secures immediate funding for the estate sufficient to pay all allowed claims in full, including post-petition interest where applicable. (Trustee's Rpt., p. 8; Trustee's Br., pp. 10–11.) He described this outcome as both rare and highly favorable in a Chapter 7 case.

---

[31] The Trustee's assessment aligns with case law recognizing that litigation involving discretionary trusts and fiduciary breach claims often requires extensive factual development, expert testimony, and prolonged proceedings. *See Mennen v. Wilmington Trust Co.*, No. 8432-ML, slip op. at 22–27 (Del. Ch. Mar. 9, 2015) (addressing lengthy and complex litigation despite credible allegations). Also, courts have repeatedly approved settlements under similar circumstances where the cost and delay of continued litigation would erode or eliminate any potential recovery. *See In re Grand Prix Assocs. Inc.*, 2009 WL 1850966, at *8 (finding settlement justified where litigation would be "expensive and lengthy").

28

(Trustee's Br., pp. 10–11.) In contrast, he found that continued litigation would expose creditors to a substantial risk of delay, diminished recovery, or no recovery at all, particularly if the estate were left with illiquid Class B shares in the APX Companies or if financing arrangements for possible future settlement offers deteriorated over time. (Trustee's Rpt., pp. 8–9.) He also noted that the $3.15 million figure, secured under the current financing terms, might not be available much longer if the litigation were to resume.[32] (*Id.*) In that context, he emphasized that prompt distribution provides a meaningful benefit to creditors, including the Debtor as the beneficiary of any surplus. He concluded that a guaranteed, immediate recovery better advances their interests than protracted litigation with uncertain results. (Trustee's Br., p. 10.)

The Trustee also considered the viability of liquidating the estate's remaining assets. He identified the Debtor's FLP interest as the only other significant holding. (Trustee's Rpt., pp. 9–10; Mar. 26 Tr., 59:7–61:22.) As discussed in Section III.B.2 *supra*, the Trustee determined that the Debtor's FLP interest suffered from transfer restrictions, had never generated distributions, and lacked a market for liquidation. Thus, he determined that it offered little prospect of yielding sufficient value to satisfy creditor claims.

That conclusion, in turn, informed the Trustee's broader assessment of the estate's primary asset: the Debtor's interest in the Trust. He reasoned that if a real estate partnership interest with documented holdings could not be monetized through ordinary means, then the Class B Trust shares—non-voting, non-controlling interests in private businesses subject to even greater transfer restrictions—would present more significant obstacles to recovery. He therefore concluded that, without a settlement, the estate would be left to pursue illiquid assets unlikely to

---

[32] The Trustee has indicated that the funds for the proposed settlement will be obtained through financing since the Trust does not contain liquid assets. As such, he has expressed concern that "the financing commitment may expire." (Trustee's Rpt., pp. 8–9.)

yield a full recovery. Based on that assessment, the Trustee determined that the proposed compromise offers a materially superior and immediate path to creditor payment that falls well within the reasonable range of outcomes for the Delaware Chancery Court Litigation. The Trustee's assessment reflects a sound, informed, and valid exercise of business judgment.

The Debtor strongly objects to the proposed settlement on the ground that it deprives her of a larger surplus and prioritizes creditor payment over her equitable interest. She asserts that the Trustee's entire focus has been on making the creditors whole while ignoring the possibility that further litigation could yield a greater return to the estate, benefiting her as the sole equity holder. (Debtor's Br., p. 6.) According to the Debtor, there is no urgency to settle, and she should not be penalized for refusing to accept the Trustee's quick and premature compromise. (Debtor's Mem., p. 8.) She further argues that the Trustee never sought her input or knowledge of the Trust structure or history, and that any information she provided was ignored. (Debtor's Mem., p. 5.) She contends that settling now unjustly rewards alleged wrongdoers and ignores the strong merits of the case and the potential "windfall" to the Trust. (*Id.*) Ultimately, she argues that the compromise diminishes the estate's value to her detriment and serves only those who have opposed her.

The Court finds that these objections do not overcome the Trustee's reasonable conclusion that the settlement serves the paramount interests of creditors. Under the applicable standard, the inquiry is not whether the settlement maximizes the Debtor's surplus, but whether it secures a fair and practical recovery for the estate in light of litigation risk, delay, and cost. Section 704(a)(1) requires the Trustee to administer and close the estate "as expeditiously as is compatible with the best interests of parties in interest." While this statutory directive requires the Trustee to weigh the interests of all parties, including the Debtor, it does not elevate any one

30

party's preference above the Trustee's broader obligations to the estate.[33] *See Yadkin Valley Bank & Trust Co. v. McGee* (*In re Hutchinson*), 5 F.3d 750, 753–54 (4th Cir. 1993) (recognizing that "[t]he duty to close the estate expeditiously will often conflict with other duties," and that the trustee must balance efficiency against the best interests of all parties in interest); *In re Key3Media Grp., Inc.*, 336 B.R. at 97–98 ("[T]he objections of the Interface Creditors cannot be permitted to predominate over the best interests of the estate as a whole.") (citing *In re Am. Rsrv. Corp.*, 841 F.2d 159, 162 (7th Cir. 1987) ("[T]he court 'must necessarily examine the relative priorities of the contested claim and the estate's other claims'"); 3 *Collier on Bankruptcy* ¶ 704.02 (16th ed. 2023) ("[I]t is the trustee's duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors[.]"). Courts consistently hold that such balancing is entrusted to the Trustee's discretion. *See In re Martin*, 91 F.3d at 394–95 (approving trustee's decision to settle based on fairness to the estate overall).

Moreover, the Trustee credibly testified that the proposed settlement would pay all allowed claims in full, with interest where applicable, and still provide a surplus to the Debtor. (Mar. 26 Tr., 47:15–25, 83:19–23.) The record reflects that no creditor objected to the compromise or questioned the adequacy of the recovery. Although the Debtor believes that pursuing the Delaware Chancery Court Litigation to its end would yield a larger recovery, she has not shown that such an outcome is probable or that the Trustee acted unreasonably in concluding otherwise. Indeed, the Debtor overlooks a fundamental risk present in every case: that the litigation could yield no recovery, or worse, a net loss to the estate after accounting for

---

[33] Nor was the Trustee obligated to consult with the Debtor about litigation strategy or case management. In any event, the Debtor's assertion that the Trustee never requested her input regarding the Trust is contradicted by the record. She testified to meeting with the Trustee to discuss the case on at least one occasion. (*See* Apr. 3 Tr., 67:7–8, 69:16–20, 71:18–21.) The record also contains multiple instances in which she expressed her position to the Trustee and others. These repeated communications rendered further outreach by the Trustee unnecessary. The Debtor has presented no evidence that the Trustee ignored her concerns. To the contrary: the record reflects that the Trustee reviewed and considered all of the Debtor's concerns and has rejected them or found them irrelevant.

31

litigation costs and expenses. Courts consistently hold that the interests of creditors, not equity holders (akin to the Debtor here), take precedence in Chapter 7 and that settlements should not be rejected merely because they do not maximize a potential surplus, as reflected in the cases already cited above.[34] The Trustee's decision to secure a prompt, certain, and complete recovery for creditors, rather than gamble on a potentially higher but uncertain return, is reasonable and sound. Hence, each of the Debtor's objections to this factor is overruled.

Given the proposed settlement's guarantee of full payment to creditors—a rare result in Chapter 7—and the risks, delays, and uncertainty associated with continued litigation and potential funding loss, the Court finds that the Trustee conducted a careful and well-supported evaluation of whether the compromise would maximize estate value and enable a fair and more immediate distribution to creditors, while still accounting for the Debtor's residual interest. The Trustee reached his conclusion after consulting with counsel, evaluating the liquidity and enforceability of estate assets, and assessing both the cost and timing of alternative outcomes. Based on this process, he determined that the proposed settlement offers a materially superior result for creditors compared to the speculative benefits of litigation or pursuit of other assets. The Court finds that this assessment reflects a sound, informed, and valid exercise of business judgment. Accordingly, the Court concludes that the fourth *Martin* factor supports approval of the proposed compromise.

---

[34] *See In re Martin*, 91 F.3d at 394–95 (affirming that a trustee's compromise must be fair and equitable to the estate and does not require maximizing return to the debtor); *In re Key3Media Grp., Inc.*, 336 B.R. at 97 (explaining that the "paramount interest of creditors" is the focus under Rule 9019); *In re Hutchinson*, 5 F.3d at 753–54 (noting trustee's duty to close estate efficiently and prioritize creditor recovery); *see also 3 Collier on Bankruptcy* ¶ 704.02 (16th ed. 2025) (trustee's fiduciary duties run to all parties in interest).

## C. THE DEBTOR'S SUPPLEMENTAL OBJECTIONS

The Debtor raises several supplemental objections in her Post-Hearing Brief in Opposition to the Trustee's Motion that, although outside the *Martin* framework, merit a brief response by the Court. These include allegations that: (1) unresolved conflicts of interest taint the proposed settlement; (2) the proposed releases are overbroad and unsupported by consideration; (3) the Term Sheet is non-binding and the final settlement agreement presented to her materially deviates from same; (4) the Trustee relied on a flawed valuation date for the APX Companies; (5) the APX Company Valuations are methodologically deficient; and (6) the Trustee overlooked the FLP as an alternate source of recovery. (*See* Debtor's Br.)

While rhetorically framed to imply significant legal defects, most of these objections are either unsupported by the record, already addressed in earlier sections of this Opinion, or rest on a misunderstanding of the Trustee's role in Chapter 7. Ultimately, they lack sufficient basis in the law to undermine the Trustee's business judgment under Rule 9019, but they are addressed briefly below in the interest of clarity and completeness.

### 1. Alleged Conflicts of Interest

The Court first addresses the Debtor's assertion that the proposed settlement is tainted by undisclosed conflicts of interest, specifically involving Attorney Robert E. Chernicoff ("Attorney Chernicoff"). According to the Debtor, Attorney Chernicoff represents both the Trust and, indirectly, her father, Mr. Papoutsis, whom she sued in the Delaware Chancery Court Litigation. (Debtor's Br., pp. 6–7.) In her view, this overlap undermines the fairness of the negotiations and raises questions about the independence of the process. (*Id.*) She objects that Attorney Chernicoff transmitted a settlement offer from Mr. Papoutsis concerning her FLP interest while

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document      Page 33 of 44

simultaneously representing the Trust, which has expressed support for the Trustee's Motion to Approve Compromise. (*Id.*)

The Court addressed this issue directly with Attorney Chernicoff on the record before the hearing commenced. (Mar. 26 Tr., 11:16–20.) In response to the Court's questions, Attorney Chernicoff confirmed that he represents the Trust, not Mr. Papoutsis personally. (*Id.*) The Court accepted this clarification at the time and reaffirms its acceptance here. (*See also id.* at 55:24–56:24.) This dispels the Debtor's suggestion that Attorney Chernicoff acted on behalf of Mr. Papoutsis in any personal capacity. Even if that were not the case, however, there is no support in the applicable rules of professional conduct to support the Debtor's assertion.

Under the Pennsylvania Rules of Professional Conduct, transmitting a settlement offer does not, by itself, create an ethical conflict or impropriety. Nor does the record suggest any collusion, insider influence, or compromised judgment. The Trustee's reliance on Attorney Chernicoff as a conduit for the offer was reasonable, and the Court finds no basis to question his independence in recommending the proposed settlement. *See In re BH & P Inc.*, 949 F.2d 1300, 1315–17 (3d Cir. 1991) (bankruptcy courts have broad discretion to evaluate conflicts and need not disqualify professionals absent a material and adverse interest to the estate). The Court is satisfied that its prior instruction to evaluate potential conflicts was followed. Accordingly, this objection is overruled.

### 2. Objection to the Scope of the Proposed Releases

The Debtor objects that the proposed settlement includes overly broad releases benefiting parties who contributed nothing to the $3.15 million settlement fund and were not named as defendants in the Delaware Chancery Court Litigation. (Debtor's Br., pp. 7–9.) She contends that the Trustee failed to disclose the full scope of these releases, did not conduct a meaningful

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document      Page 34 of 44

investigation into their propriety, and seeks to shield fiduciaries and advisors who allegedly engaged in coercive conduct during the pre- and post-petition trust administration. (*Id.*) In support of these arguments, she cites *In re Washington Mutual, Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) and *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000), which address non-consensual third-party releases in Chapter 11 plans.[35] (*Id.* at 9 n.15.) She further asserts that specific roles under the Trust documents, such as the distribution advisor, are omitted from the agreement in a manner that suggests strategic avoidance of accountability. (*Id.* at 9.)

Nothing in Rule 9019 requires that each released party contribute separately to the settlement fund. The relevant inquiry is whether the compromise, viewed as a whole, falls within the range of reasonableness and serves the best interest of the estate. The record supports that conclusion. The Trustee submitted a written report outlining the settlement's material terms, including his intent to resolve all estate-owned claims through a global release. While he had not reviewed the final release language at the time of the hearing, he testified that he would do so before executing any agreement on behalf of the estate. (Mar. 26 Tr., 77:8–14 ("I am not intimately familiar with the terms of the proposed formal settlement agreement. I did not review that at length because, unless or until this settlement was -- is accepted, I would contemplate signing on behalf of the estate a formal settlement agreement, and I would review whatever was prepared for that purpose.").) To the extent the Debtor argues that the Trustee's disclosure did not fully comply with the Court's prior order, the Court finds that the inclusion of releases for affiliated or successor parties does not render the proposed settlement unreasonable subject to the

---

[35] The Court finds the Debtor's reliance on *Washington Mutual* and *Continental Airlines* misplaced. These cases address releases of personal claims not owned by the estate. Here, the Trustee seeks to settle only estate-owned claims. The distinction is dispositive, and the Court finds that these cases do not support the Debtor's objection.

condition that the fully executed final settlement agreement must be submitted to the Court for review before final approval.

The Court also rejects the Debtor's broader allegations that certain fiduciaries engaged in coercive conduct, obstructed her access to trust assets, or should be excluded from the release provisions. These allegations lack supporting evidence in the record. Whether or not specific fiduciary roles or individuals are named in the final agreement does not restrict the Trustee's ability to release claims owned by the estate, so long as the compromise falls within the range of reasonableness. The Trustee is not required to litigate each allegation to judgment before electing to resolve them through compromise. Indeed, this is the whole purpose of settling litigation. The Court will confirm, upon review of the final settlement agreement, that its terms are consistent with the record and the Trustee's stated intent.

The Court again notes that the claims at issue are property of the estate under Section 541 and may be compromised by the Trustee under Section 704(a)(1) without the consent of creditors or the Debtor. The Trustee testified that the proposed settlement was intended to resolve all estate-owned claims arising from the Delaware Chancery Court Litigation. (Mar. 26 Tr., 80:17–82:13.) His judgment to pursue a global resolution—including releases for affiliated parties—is entitled to deference. Therefore, subject to the condition stated above, these objections are overruled.

### 3. Objection Regarding Term Sheet and Final Agreement

The Debtor next argues that the Term Sheet was non-binding, that successive versions of the proposed final settlement agreement deviated materially from it, and that her pre-petition

signature on the Term Sheet was procured under duress.[36] (Debtor's Br., pp. 9–11.) She further contends that the Trustee failed to address substantial changes in the final settlement agreement, including the removal of escrow protections and firm deadlines, the addition of a $100,000 payout to another beneficiary, the incorporation of a 120-day claims bar under 12 Del. Code § 3585, and the elimination of certain remedial provisions. (*Id.* at 10.) She also objects that the Second Amendment to the Trust evidences the material changes from the Term Sheet to the final settlement agreement she reviewed.[37] (*Id.*)

These arguments do not undermine the Trustee's business judgment under *Martin*. While the Debtor contends that the changes from the Term Sheet to the final settlement agreement that she reviewed were material and unfavorable, she does not explain why these changes were significant enough to affect the reasonableness of the proposed settlement. Indeed, the Court finds that the changes highlighted by the Debtor do not independently discredit the Trustee's evaluation. The Court also notes that it is neither unusual nor improper for a final agreement to differ from a preliminary term sheet, provided that the final agreement falls within the range of reasonableness. Further, the relevant question under Rule 9019 is not whether the Debtor personally agreed to each term, but whether the Trustee's evaluation of the compromise was fair, reasonable, and in the best interests of the estate. Instead, it is the Trustee's independent

---

[36] With respect to the Debtor's argument that she signed the Term Sheet under duress, the Court notes that the Trustee does not rely on the Term Sheet as a binding agreement or as exclusive evidence of the Debtor's consent to settle, but rather as part of the historical context of negotiations and the parties' movement toward resolution. As such, the Court makes no findings as to the Debtor's allegations of duress, because her consent is not the basis for approving the settlement. Instead, it is the Trustee's independent assessment, based on the risks, costs, and potential recovery of litigation, that controls under the governing legal standard.

[37] The Debtor has not indicated why the Second Amendment reflects a material change that should concern the Court. Moreover, the Trustee and Attorney Atlas testified that they reviewed the Second Amendment to the Trust and determined that it was not relevant, material, or significant. (Mar. 26 Tr., 57:3–59:6, 128:2–23.) Thus, the Court finds that the Debtor's argument does not impact the Court's conclusion that the Trustee exercised proper business judgment in this case.

37

assessment, based on the risks, costs, and potential recovery of litigation, that controls under the governing legal standard.

The Court acknowledges that the Debtor's general concerns about potential differences between the Term Sheet and the final settlement agreement may be relevant if material deviations are shown. At this stage, however, the Court finds that these concerns are adequately addressed by conditioning approval of the settlement on the Trustee's submission—and the Court's review—of the executed final settlement agreement, including confirmation that it contains the representations, warranties, and protections described on the record.

This objection is therefore overruled in part. The Court finds that the settlement's reasonableness does not depend on the Debtor's personal agreement to its terms or on a perfect match with the Term Sheet. The record supports the Trustee's judgment. Final approval remains subject to the Trustee's submission of the executed final settlement agreement and the Court's review for consistency with the record.[38]

### 4. Objection to Valuation Date

The Debtor further objects to the Trustee's reliance on the APX Company Valuations. (Debtor's Br., p. 11–12.) Specifically, she argues that the December 31, 2023 valuation date of those reports presents an unfair "snapshot" that fails to reflect prior or subsequent developments, including ongoing misconduct. (*Id.*)

The Court finds no basis to conclude that the Trustee's reliance on the APX Company Valuations on these grounds was improper or inconsistent with his duties under Section

---

[38] The Court has already addressed the Debtor's objections concerning the delayed or incomplete disclosure of Trust-related documents, including the Second Amendment, the First Amendment, and Schedule A. *See supra* Section III.B.1. As explained there, the absence of these documents does not materially undermine the Trustee's evaluation of the litigation or the fairness of the proposed settlement under *Martin*. The Trustee and Attorney Atlas acknowledged the possibility of undisclosed assets but concluded that any such risk was limited and reasonably accounted for in the settlement. The Court agrees.

704(a)(1). As previously discussed, the Trustee reviewed the December 31, 2023 APX Company Valuations, considered that Attorney Atlas had negotiated a $350,000 premium above the appraised value for the Debtor's interest, and reasonably treated the $3.15 million figure as a credible and risk-adjusted benchmark for settlement. This Court has already found that his approach was reasonable and a valid exercise of business judgment. That finding largely disposes of the Debtor's objection here.

Nonetheless, the Court briefly addresses it. The Debtor's suggestion that the valuation reports are outdated or fail to reflect subsequent developments is speculative and unsupported by expert opinion or admissible evidence. She has not offered a competing appraisal or independent analysis, nor has she shown that any post-valuation developments materially affected the value of the APX Companies or their Class B stock. Her references to "subsequent major developments" and "continuing breaches" are vague and unsubstantiated by any quantifiable showing of harm to Trust assets. Similarly, her allegation that accounting irregularities may have been used to obscure misconduct or preserve the status quo is speculative and unsupported. More broadly, the Court has already found that the record does not substantiate the Debtor's allegations of fraud, fiduciary misconduct, or collusion. *See supra* Section III.B.1. Thus, on this record, the Trustee's use of the December 31, 2023 valuation date does not undermine the fairness or reasonableness of the proposed settlement under the first *Martin* factor. This objection is overruled.

### 5. Objection to Valuation Methodology and Expert Analysis

The Debtor challenges the Trustee's reliance on the APX Company Valuations, arguing that they are methodologically flawed and biased. (Debtor's Br., pp. 12–13.) Specifically, she asserts that the reports rely on unaudited financials, omit an asset-based valuation, and fail to

39

reconcile internal inconsistencies. She further contends that the reports are unreliable due to bias and lack of independent verification. (*Id.* at 13.)

The Court finds these objections unpersuasive. Under Rule 9019 and the standard articulated in *In re Martin*, the Trustee was not required to obtain a litigation-grade valuation or resolve all factual uncertainties surrounding the APX Companies' finances. Instead, the Trustee needed only to exercise informed and reasonable business judgment based on available information, potential litigation risks, and evidentiary burdens. *See In re Martin*, 91 F.3d 389 (3d Cir. 1996). The record reflects that the Trustee fulfilled that obligation. Testimony from Ann Meltzer established that standard income and market approaches were used and that the asset-based method was considered but rejected as unreliable for these particular companies. (Apr. 3 Tr., 209:22–210:22.) The Debtor has not offered any admissible expert testimony, competing appraisal, or authoritative support to show that this methodology was inappropriate under professional valuation standards.[39]

The Debtor also argues that the valuations are discredited by potential bias stemming from the identity of the commissioning party. However, while there was some ambiguity in the testimony regarding who retained Tucker & Meltzer, *see* Apr. 3 Tr., 214:4–9, 217:20–218:5, the mere fact that an adverse party commissioned the reports does not, without more, render them unreliable. The Debtor has provided no evidence of manipulation, distortion, or methodological error that would warrant exclusion of the reports or undermine their probative value. Conclusory allegations of bias are insufficient to carry even a minimal evidentiary burden. More importantly, the Trustee acknowledged these potential limitations. He testified that he considered the source

---

[39] The cases cited in the Debtor's brief on this issue involve courts evaluating competing expert reports on a full evidentiary record, rather than a court assessing whether a trustee's reliance on a valuation for settlement purposes was reasonable. As such, the Court disregards these cases as distinguishable and therefore inapplicable.

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document    Page 40 of 44

of the reports, relied on his counsel's review of the methodology, and ultimately determined that the valuations were sufficiently reliable for purposes of settlement analysis. (Mar. 26 Tr., 43:3–25.) The Trustee also relied upon the fact that Attorney Atlas had negotiated a $350,000 premium above the stated valuation figures to account for known risks, undisclosed assets, and deal contingencies. This premium reflects a deliberate effort to protect the estate from downside exposure and demonstrates that the Trustee did not blindly accept the reports but evaluated them as part of a broader risk-reward calculus.

On this record, the Court finds that the Trustee's reliance on the APX Company Valuations as part of his overall settlement analysis was reasonable and consistent with his obligations under Rule 9019. Accordingly, the Debtor's objection is overruled.

### 6. Objection to Trustee's Valuation of the FLP Interest

The Debtor next renews her objection that the Trustee undervalued her interest in the FLP by relying on a capital account figure from one of her sister's K-1, failing to obtain a formal appraisal, and overlooking potential real estate value and encumbrances. (Debtor's Br., pp. 13–15.) She further argues that the $500,000 offer from Mr. Papoutsis lacked independent verification and reflected a flawed, conflict-laden process. (*Id.* at 14–15.)

These arguments raise no new issues. As discussed above, *see supra* Sections III.B.2 and III.B.4, the Court has already considered and rejected the Debtor's contention that the Trustee inadequately evaluated the FLP or that the negotiation process was impacted by conflicts of interest. The record shows that the Trustee attempted to market the FLP interest, secured what he considered the highest and best offer (which the Debtor declined), and reasonably concluded that the asset was illiquid and not readily marketable. His treatment of the FLP interest as having

41

limited settlement value was well within the bounds of his business judgment and does not undermine the fairness of the proposed compromise. No further findings are necessary.

### D. OVERALL FAIRNESS AND REASONABLENESS OF THE PROPOSED SETTLEMENT

Under the standards articulated in *In re Nortel Networks, Inc.* and *In re Key3Media Grp., Inc.*, the Court need not determine whether the proposed compromise represents the best conceivable outcome for the estate. The relevant inquiry is whether the settlement falls within the reasonable range of litigation possibilities—specifically, whether it exceeds the lowest point in that range.

As discussed above, the Court has found that the estate's likelihood of prevailing at trial is limited, that any resulting recovery would likely consist of illiquid and difficult-to-monetize Class B shares of closely held companies, and that the cost and delay of continued litigation could significantly diminish net recovery. The likelihood of collecting a monetary judgment from the named defendants remains speculative. By contrast, the proposed settlement guarantees full payment of all allowed creditor claims, provides immediate liquidity to the estate, and preserves a meaningful surplus for the Debtor.

The Trustee's evaluation also reflects consideration of the arms-length settlement discussions conducted prior to this case, including the parties' competing valuation estimates, their evolving litigation posture, and their ultimate convergence on a $3.15 million resolution. The Trustee reasonably treated this outcome as reflecting a fair, risk-adjusted assessment of what could realistically be achieved through further litigation, confirming that the proposed compromise exceeds the baseline of reasonableness.

Case 1:24-bk-03264-HWV    Doc 409    Filed 05/28/25    Entered 05/28/25 10:30:28    Desc
Main Document      Page 42 of 44

On this record, the Court finds that the proposed settlement falls well within the range of reasonableness. It delivers a prompt, certain, and superior result for the estate under *In re Martin* and Rule 9019.

## IV. CONCLUSION

For the reasons set forth above, and having evaluated the proposed compromise under Rule 9019 and the controlling Third Circuit precedent in *In re Martin*, the Court finds that the settlement, as represented in the Term Sheet, the Trustee's Report, and the hearing record, falls well within the reasonable range of litigation possibilities and satisfies all four *Martin* factors. The Trustee has demonstrated, through a well-supported analysis, that the proposed resolution is informed, practical, and consistent with his obligations under 11 U.S.C. § 704(a)(1). The record supports the conclusion that the Trustee exercised sound business judgment in reaching this compromise, based on consultation with counsel, review of the legal posture, and a realistic assessment of value, risk, and delay. That judgment is entitled to deference under applicable law.

At the same time, the Court cannot ignore its independent duty to ensure that any compromise approved under Rule 9019 is fair, equitable, and consistent with the Trustee's representations. As the Supreme Court explained in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion[.]" 390 U.S. 414, 424–25 (1968). Although the Trustee has described the essential terms of the settlement in his filings and testimony, the Court has not yet been provided with the final, executed settlement agreement. Without reviewing the operative document—including any

Case 1:24-bk-03264-HWV   Doc 409   Filed 05/28/25   Entered 05/28/25 10:30:28   Desc
Main Document      Page 43 of 44

release provisions, trust amendments, or representations referenced in the Term Sheet—the Court cannot fully discharge its oversight responsibility under Rule 9019.

Accordingly, the Court's approval of the settlement is expressly conditioned on the Trustee's submission of a fully executed agreement that materially conforms to the Term Sheet, Doc. 189-8, the Trustee's Report, Doc. 189, and the representations made on the record during hearings and pleadings. In addition, the final agreement should include: (1) a provision for the agreed $3.15 million in consideration to the estate; (2) the representations and warranties described by the Trustee and Attorney Atlas, which are intended to protect the estate against material misrepresentation; and (3) release provisions not inconsistent with the Term Sheet. The Court does not require perfect textual conformity with the Term Sheet, but reserves authority to withhold final approval if the executed agreement deviates materially from the substantive requirements outlined above. That determination rests with the Court alone. Absent such a deviation, further objections based on immaterial, stylistic, or non-substantive changes will not be entertained.

Subject to these conditions, the Court concludes that the proposed compromise is fair, equitable, and in the best interests of the estate. The Trustee's Motion to Approve the Settlement is therefore **GRANTED on a conditional basis**, consistent with the terms of this Opinion.

An appropriate Order will follow.

By the Court,

Henry W. Van Eck, Chief Bankruptcy Judge
Dated: May 28, 2025

44