UNITED STATES BANKRUPTCY COURT MIDDLE DISTRICT OF PENNSYLVANIA

In re:
IRENE MULKERIN, Debtor.
Chapter 7 (pending conversion to Chapter 13)
Case No. 1:24-bk-03264-HWV

FILED
**August 25, 2025**
Clerk, U.S. Bankruptcy Court
Middle District of Pennsylvania
Wilkes-Barre

**DEBTOR'S REPLY TO CHAPTER 7 TRUSTEE'S OPPOSITION TO CONVERSION (DKT. 580)**

NOW COMES the Debtor, Irene Mulkerin, pro se, and respectfully submits this Reply to the Opposition filed by Chapter 7 Trustee Steven Carr (Dkt. 580). This filing should be read in conjunction with Debtor's Comprehensive Supplemental Reply (Dkt. 578), which addressed the objections of all parties. Here, the Debtor directly rebuts Trustee Carr's accusations of "bad faith" and "abuse of process."

## I. LEGAL STANDARD

1. Section 706(a) provides that a debtor may convert a Chapter 7 case to Chapter 13 "at any time," provided the case has not been previously converted and the debtor is eligible.

2. The Supreme Court in Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365 (2007), held that conversion may be denied only upon clear evidence of bad faith or statutory ineligibility.

3. The burden rests on the objecting party. In re Campbell, 598 B.R. 775, 778 (Bankr. M.D. Pa. 2019).

4. Carr has not demonstrated concealment, fraud, or abuse by the Debtor. His accusations rest on mischaracterizations of the record, selective focus on trivialities, and his own refusal to investigate substantial estate-level misconduct.

## II. TRUSTEE MISCHARACTERIZES DEBTOR'S POSITION ON ABANDONMENT

5. Carr argues that Debtor acted in bad faith by urging abandonment of the FLP and later objecting to it. This is a distortion.

6. From the outset of this case, Debtor consistently identified the FLP and Trust as overlapping, interrelated, and tainted by fiduciary misconduct. She raised these concerns repeatedly, long before the compromise was filed.

7. Debtor consistently warned Carr of dual representation (Attorney Chernicoff appearing for both Trust and FLP; Don Kornfield as FLP attorney & trustee of Trust, etc) and the likely misuse of FLP assets for APX operations.

8. Despite this, Carr ignored the evidence completely, pressed ahead with the compromise, and now feigns surprise that Debtor continues to demand accountability inside bankruptcy court.

9. As a pro se litigant, Debtor misunderstood the technical meaning of "abandonment." She believed it meant she could pursue recovery herself for the benefit of creditors, not that the asset would be forever lost to the estate.

10. At no point did Debtor intend or state that she would remove the FLP from creditor reach. Her filings consistently stress that the FLP is valuable and must not be prematurely relinquished.

11. A misunderstanding of terminology is not bad faith. The consistent through-line of Debtor's actions is preservation of FLP value for creditors and the estate.

## III. TRUSTEE'S CONTRADICTORY CONDUCT DEMONSTRATES ABUSE OF PROCESS

12. Carr has repeatedly refused to investigate fraud and conflicts of interest despite being presented with copious evidence: phantom income on K-1s, overlapping obligations between Trust and FLP, and sworn testimony of misuse of FLP assets.

13. Instead, Carr devotes estate resources to opposing the Debtor at every turn. He has filed opposition after opposition while disregarding the substance of sworn affidavits and documentary proof.

14. At hearings, Carr interrogated Debtor at length about substitute teaching income and other trivial matters, while refusing to examine large-scale estate issues.

15. Carr's conduct is further illustrated by his treatment of tax returns. The Debtor provided Carr with evidence that her K-1s contained fraudulent or inaccurate entries, creating distorted tax liabilities. Yet Carr repeatedly urged the Debtor to "just file" her tax returns anyway, effectively advising her to submit false information solely to facilitate quick closure of the estate. A trustee's duty is to ensure that estate records are accurate, not to pressure a debtor to file on the basis of fraudulent data.

16. The Trustee's misplaced priorities were also on full display at the 341 meeting of creditors. Rather than probing the substantial issues of estate value — including the Debtor's interests in the Trust, the FLP, or her adversarial claims against creditors — Carr devoted the bulk of his questioning to small assets and spent considerable time examining the Debtor's substitute teaching job, demanding 12 months of statements for Venmo, PayPal, and Zelle accounts, and insisting on records concerning $500 worth of Disney stock purchased years ago for her goddaughter. He questioned a $5,000 deposit her husband borrowed from a friend and pursued information about shuttered LLCs that no

3 of 12

Case 1:24-bk-03264-HWV    Doc 582    Filed 08/25/25    Entered 08/25/25 09:57:38    Desc
Main Document    Page 3 of 12

longer produce income. By contrast, Carr asked virtually nothing about the Trust, the FLP, or the fraud evidence the Debtor had repeatedly submitted.

17. At the same 341 meeting, Carr pressed the Debtor repeatedly on whether she had any ownership interest in Mulkerin Holdings or her husband's business entities. The Debtor answered truthfully and consistently: she never had ownership in those companies. Carr therefore knew, as early as the creditors' meeting, that the Wolfe and Traditions claims arose from her husband's business debts, where she was at most a secondary guarantor. Yet in his Opposition, he now mischaracterizes her targeted objections to those claims as "bad faith." The record proves otherwise: Carr himself established the distinction under oath and now ignores it.

18. This selective focus underscores the Debtor's point: Carr has not acted to maximize estate value or investigate fraud but instead has devoted his attention to inconsequential minutiae while using this distraction to continue to obstruct meaningful inquiry. That pattern cannot be squared with his fiduciary duty under § 704(a)(4).

19. Carr cannot have it both ways. He has refused to pursue any investigation into estate assets and claims while serving as Chapter 7 Trustee, and now he seeks to prevent the Debtor from converting to Chapter 13 where she could pursue those investigations herself. This double obstruction reveals the true purpose of Carr's strategy: not the neutral administration of the estate, but the suppression of inquiry altogether.

## IV. THE DOCKET ITSELF REVEALS THE STRATEGY OF OBSTRUCTION

20. As this Court has observed, one need only look at the docket to understand a party's legal strategy. The docket in this case speaks plainly.

21. The Debtor has filed motion after motion seeking transparency: Rule 2004 examinations, turnover of records, objections to inflated or conflicted claims, and efforts to preserve the FLP. Each filing has been supported by evidence, affidavits, or financial records.

22. In response, the Trustee and aligned parties — including the Trust and creditor counsel — have met every request not with investigation, but with opposition. Not once has Carr substantively addressed the Debtor's evidence. Instead, he has filed repeated oppositions, procedural motions, and threats of sanctions, all designed to deflect, delay, and prevent meaningful inquiry.

23. The pattern is unmistakable: while the Debtor has sought to bring evidence forward, the Trustee and his allies have sought to suppress it. The docket itself reveals not good faith administration, but a coordinated strategy of obstruction whose consistent objective has been to shield conflicted fiduciaries and rush closure without investigation.

24. That strategy — to "prevent, prevent, prevent" transparency — is not business judgment. It is abuse of process and obstruction of estate administration.

## V. TRUSTEE CANNOT HIDE BEHIND "BUSINESS JUDGMENT"

25. The Court previously noted that the "business judgment" standard is a low bar. But the business judgment rule presumes good faith, informed decision-making, and attention to estate interests. That presumption is rebutted where the trustee refuses to investigate known fraud or ignores critical evidence.

26. In its opinion approving the compromise (Dkt. 409), this Court specifically recognized that Carr was aware of the Debtor's concerns and evidence of fraud, but chose not to investigate further, instead exercising his "business judgment" to proceed. That finding does not erase the concerns; it confirms

5 of 12

Case 1:24-bk-03264-HWV    Doc 582    Filed 08/25/25    Entered 08/25/25 09:57:38    Desc
Main Document    Page 5 of 12

them. The Court acknowledged that the Debtor raised these issues on the record and that Carr simply declined to act.

27. Carr cannot now claim the Debtor never raised these issues, nor can he argue that her continued pursuit of them demonstrates bad faith. The opposite is true: the record shows the Debtor raised them repeatedly, and Carr ignored them.

28. Since approval of the compromise, Carr has moved further outside the bounds of judgment into abdication. He has openly stated, in connection with the 120-day claims bar, that he will not investigate whether the warranties in the settlement were truthful — and that the Debtor may not do so either. That is not "judgment"; it is a refusal of oversight.

29. Sworn affidavits establish that the FLP was improperly pledged as collateral for APX operations. Carr has ignored this evidence and continues to seek abandonment, treating the FLP as worthless despite proof to the contrary.

30. Carr has also disregarded financial records establishing phantom distributions and fabricated liabilities. Rather than pursue these leads, he uses estate funds to oppose the Debtor personally.

31. The business judgment rule does not protect willful blindness. It cannot shield a trustee who refuses to investigate fraud, blocks others from doing so, and devotes resources to silencing a surplus debtor. That conduct exceeds judgment and amounts to obstruction of estate administration.

## VI. THE UNUSUAL ALIGNMENT OF TRUSTEES AND FIDUCIARIES AGAINST THE DEBTOR

32. Perhaps most telling is the alignment of nearly every fiduciary in this case against the Debtor. The Chapter 7 Trustee, the Chapter 13 Trustee, the Trust

(which has already been paid through the compromise and no longer holds a pecuniary interest), and certain creditors have all joined in opposing conversion.

33. This unified opposition is not normal. In an ordinary case, trustees act independently and neutrally, with their duties defined by statute. Here, both the Chapter 7 Trustee and the Chapter 13 Trustee have taken the unusual step of opposing a surplus debtor's attempt to exercise her statutory right to convert. That alignment does not serve creditors, who will be paid in full in either chapter, but instead reflects an institutional preference for closure and avoidance of scrutiny.

34. The Bankruptcy Code was designed to protect both creditors and debtors alike. To deny conversion under these circumstances would signal that debtor protections are expendable whenever trustees collectively prefer expediency. The Court should reject that outcome and preserve the balance intended by Congress by granting the Debtor's good-faith Motion to Convert.

## VII. THIS CASE EXPOSING A BROADER SYSTEMIC PROBLEM

35. The alignment in this case is not just unusual — it exposes a deeper systemic problem. The York and Harrisburg area has long been known for an insider business culture in which entrenched actors protect one another and shut out those who challenge them.

36. That dynamic is reflected here. The same insiders who orchestrated against of the Debtor's husband, Andrew Mulkerin, from his businesses have now appeared in the Debtor's own bankruptcy. The Wolfes, Traditions Bank, and the APX/FLP fiduciaries all emerge from the same small circle of business actors who initially sought to eliminate an outsider they viewed as a

competitive threat, and who, once he resisted and began exposing their conduct, have acted in concert to protect themselves from accountability.

37. What began as coordinated efforts against Mr. Mulkerin has now been carried forward against the Debtor. The result is a bankruptcy process dominated not by independent fiduciaries, but by a network of insiders aligned to protect one another.

38. This is not how the Bankruptcy Code was designed to function. The Code protects both debtors and creditors. Its legitimacy depends on fairness, not on insiders closing ranks. To deny conversion in this case would ratify a strategy of institutional self-protection at the expense of both the Debtor's statutory rights and the system's integrity.

39. The Debtor has been consistent from the outset: she has sought only transparency, accountability, and preservation of value for the estate. The resistance she has faced — across multiple trustees, fiduciaries, and creditors — demonstrates that the problem is not with her good faith, but with a system that resists scrutiny.

## VIII. TIMING DOES NOT CONSTITUTE BAD FAITH

40. Carr argues that because the Motion to Convert was filed after the compromise, it must be in bad faith. This ignores the record.

41. Debtor repeatedly stated in filings and at hearings that she intended to seek Chapter 13 conversion but did not understand that she could file earlier.

42. Honest misunderstandings by a pro se litigant are not evidence of bad faith. Marrama requires proof of concealment or abuse of process, not procedural missteps.

43. Debtor's motive is legitimate: (a) ensure proper adjudication of claims; (b) preserve the FLP and related causes of action; and (c) protect surplus rights under § 726(a)(6). All creditors will be paid in full under the proposed plan.

## IX. MOTIVE DEMONSTRATES GOOD FAITH

44. The Supreme Court in *Marrama* makes clear that conversion may be denied only where a debtor acts in bad faith, with improper motive such as concealment or abuse of process. The Debtor's motive here has been transparent and consistent throughout: to pay creditors in full, to preserve value in the FLP, and to investigate credible evidence of insider fraud.

45. These are legitimate and proper objectives that align with the very purposes of the Bankruptcy Code. They cannot reasonably be characterized as bad faith.

46. By contrast, the Trustee's motive is evident from the record. His consistent objective has been to rush closure of the estate, to suppress inquiry into fraud and conflicts, and to protect fiduciaries and creditors aligned with the Trust. This inversion of priorities — protecting insiders rather than maximizing estate value — underscores why the Debtor's good-faith request to convert should be granted.

## X. DEBTOR'S CLAIM OBJECTIONS AND ELIGIBILITY ARE CONSISTENT WITH GOOD FAITH

47. Carr emphasizes that the Debtor "objected to 8 of 12 claims." This is misleading. Three of those claims were filed by Traditions Bank, arising from a single lending relationship with Mulkerin Holdings. The bank divided the liability into three separate judgments, but all stem from the same insider-driven debt structure.

48. Likewise, the claims of Keith and Lisa Wolfe also arise from Mulkerin Holdings. Both the Wolfe and Traditions claims are therefore not ordinary consumer debts of the Debtor, but business-related obligations of her husband's company for which she was only a secondary guarantor. These claims are intertwined with the same APX/FLP/Trust scheme that forced both the Debtor and her husband into bankruptcy.

49. By contrast, the only debts the Debtor personally incurred — four claims for credit cards and utilities — were not objected to. This demonstrates that the Debtor is not objecting in bad faith or to avoid legitimate obligations. She is objecting only to claims tied to her husband's business creditors and the conspiracy that engulfed them.

50. Carr also misstates the Debtor's Chapter 13 eligibility. The Traditions Bank judgments are secured claims, not unsecured, and cannot be counted against the unsecured debt ceiling under 11 U.S.C. § 109(e). The Wolfe claim is disputed and unliquidated, and therefore should not be included under established precedent. See In re Pennypacker, 115 B.R. 504 (Bankr. E.D. Pa. 1990). Administrative expenses such as professional fees likewise do not count toward the § 109(e) calculation.

51. Properly categorized, the Debtor remains well within the statutory limits for Chapter 13 eligibility. Carr's attempt to distort the claims register into evidence of bad faith is not supported by the record.

52. This is not the first time this issue has arisen. The Chapter 13 Trustee previously mischaracterized the Debtor's secured debts as unsecured, and the Debtor corrected the record. The Wolfes then repeated the same mischaracterization, and the Debtor corrected it again. Now Trustee Carr repeats the same inaccurate statements. These are bankruptcy professionals

who know the governing rules. The repeated recycling of the same error cannot be viewed as innocent. It is either an attempt to confuse the Court or a strategy to obtain by repetition what cannot be obtained by law. The Court should reject these misstatements once and for all.

## XI. THE TRUSTEE OBJECTS NOT TO CLAIMS, BUT TO INVESTIGATION ITSELF

53. The ultimate irony in Carr's argument is this: every claim the Debtor has objected to is one that she has sought to investigate through legitimate discovery tools. The Trustee, rather than joining in that investigation to protect creditors, has consistently opposed it.

54. When the Debtor sought Rule 2004 examinations, Carr objected. When the Debtor sought trust and FLP records, Carr objected. When the Debtor raised sworn affidavits and financial irregularities in support of claim objections, Carr ignored the substance and filed opposition.

55. Carr has thus positioned himself not as a neutral fiduciary interested in verifying the validity of claims, but as an obstacle to inquiry itself. The Trustee's strategy has been to prevent investigation, prevent discovery, and prevent transparency. That strategy serves neither creditors nor the Debtor. It serves only to protect conflicted fiduciaries and to rush closure of the estate without meaningful oversight.

56. The Debtor's objections to claims are therefore consistent with good faith, as they are rooted in a desire to uncover the truth. By contrast, the Trustee's objections to the Debtor's motions reveal a pattern of obstruction that should concern anyone committed to ensuring the bankruptcy system functions as intended. That the Trustee may be uneasy about his own conduct being

scrutinized is not a valid basis to block legitimate inquiry or prevent open discussion before the Court.

## XII. CONCLUSION

For the foregoing reasons, Trustee Carr's Opposition (Dkt. 580) should be overruled, and Debtor's Motion to Convert to Chapter 13 should be granted forthwith.

Finally, the Court need not take Debtor's word alone. In a typical Chapter 7, a trustee investigates fraud, pursues recovery of assets, and ensures accurate reporting. Here, Carr has ignored affidavits, declined to investigate obvious irregularities, pressured the Debtor to file tax returns based on records she demonstrated were fraudulent, and aligned himself with parties adverse to the estate. This is not normal trustee behavior. It is obstruction of estate administration, and it should not be rewarded by denying the Debtor's good-faith motion to convert.

Respectfully submitted,

Dated: August 25, 2025

/s/ Irene Mulkerin

Debtor, Pro Se